FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 JUL -3 AM 8: 39

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| | ) DIVISION ONE |
| Respondent, | ) |
| | ) No. 74745-2-I |
| v. | ) |
| | ) PUBLISHED OPINION |
| BRYAN EUGENE STREEPY, | ) |
| | ) FILED: July 3, 2017 |
| Appellant. | ) |
| | ) |

DWYER, J. — Bryan Streepy appeals from the judgment entered on a jury's verdict finding him guilty of attempted assault in the second degree, harassment based upon threats to kill, four counts of unlawful possession of a firearm in the second degree, and assault in the fourth degree. On appeal, Streepy contends that the trial court erred by admitting testimony setting forth out-of-court statements of the victim's son and by declining his request to cross-examine the victim regarding her immigration status. We disagree and, accordingly, affirm the convictions.

Streepy also contends, and the State concedes, that the trial court erred by failing to treat the convictions for attempted assault and felony harassment as constituting the same course of criminal conduct for sentencing purposes. We accept this concession and remand for resentencing.

I

Streepy and his ex-fiancé, J.G., lived together in Oak Harbor, Washington. J.G.'s sister, her two children, and J.G.'s seven-year-old son, S.G., also resided in the apartment. Streepy was emotionally and physically abusive toward J.G. throughout their relationship.

In September 2015, Streepy became irate and began screaming at J.G., punching walls, and ordering her to leave the apartment. J.G. moved out but later agreed to return to the apartment after Streepy apologized and offered to let J.G. stay in the apartment by herself while he looked for another accommodation. Although Streepy initially left the apartment, he moved back in shortly after J.G. returned.

After the two resumed living together, Streepy became convinced that J.G. was cheating on him. On October 5, 2015, J.G. rebuffed Streepy's attempt to have sex with her. Streepy began screaming at J.G., calling her a "lying little cheating whore." J.G. then laid on the couch, where upon Streepy began punching her shoulder and the pillow behind her head. Streepy told J.G. that he "was a Marine and that if he really wanted to he could really hurt [J.G.] like he hurt his enemies at war."

On October 14, 2015, J.G. returned from work and fell asleep on the couch with S.G. Shortly thereafter, Streepy awakened J.G. and commanded her to sleep in the bedroom. J.G. refused and Streepy became upset. J.G. brought S.G. into the bedroom with her—hoping that S.G.'s presence would placate Streepy—and tried to fall asleep. Streepy came into the room, pinned J.G. down,

and asked her to explain why she would not be intimate with him. J.G. told Streepy that she was afraid of him. Streepy became upset and began screaming at J.G. that she was a cheating whore and a slut and that she needed to pack her stuff. J.G. told S.G. to go into the other room.

J.G. and Streepy argued and Streepy threw himself at J.G., pulling her hair, screaming at her, and trying to gouge out her eye. Streepy began to choke J.G., shouting at her that he was going to kill her. S.G. returned to the bedroom and starting screaming. Streepy yelled at S.G. to "shut up, bitch!" J.G.'s sister started calling out for J.G. J.G. ran into her sister's bedroom and told her sister that Streepy was trying to kill her. Streepy then began to argue with J.G.'s sister, yelling at her to get out of the apartment. J.G. ran into the bathroom and called 911. J.G. could hear Streepy coming toward the bathroom so she abruptly ended the 911 call and ran back into the bedroom. Streepy found J.G. in the bedroom, shoved her against the dresser, threw her on the bed, and began trying to choke her again.

Two police officers arrived while the struggle was still ongoing. From outside of the apartment, the officers could hear Streepy shouting. The officers knocked on the door. Streepy answered, wearing a backpack. The officers asked Streepy to step outside and place the backpack on the ground. Officer Michael Clements went inside to check on J.G. while Officer Mel Lolmaugh stayed outside with Streepy. Streepy continued to be aggressive and hostile toward Officer Lolmaugh and Officer Lolmaugh was forced to handcuff Streepy for the officer's own safety.

Inside the apartment, Officer Clements found J.G. shaking and obviously upset. Officer Clements asked J.G. what had happened. J.G. told Officer Clements that she and Streepy had an argument and that Streepy had tried to choke her. Officer Clements then asked S.G., who was standing nearby, what he saw. S.G. was terrified and crying. S.G. told Officer Clements that Streepy was punching his mom and saying that he was going to kill her.

Based on the statements made by J.G. and S.G., the officers found probable cause to arrest Streepy. After the arrest, Officer Clements searched Streepy's backpack and found a handgun inside. Several other firearms were later discovered in Streepy's bedroom and inside of Streepy's vehicle. A third police officer arrived at the apartment shortly after the arrest and that officer conducted a formal interview of J.G., her sister, and S.G.

Prior to trial, the State moved to exclude evidence regarding J.G.'s immigration status and potential eligibility for a visa. The trial court granted the motion after hearing testimony from J.G. Counsel for Streepy then moved to exclude from evidence the statements that S.G. made to Officer Clements.[1] The trial court denied the motion. Streepy was found guilty of attempted assault in the second degree, harassment based upon threats to kill, four counts of unlawful possession of a firearm in the second degree, and assault in the fourth degree. He timely appeals.

---

[1] S.G. did not testify at trial.

- 4 -

II

Streepy first contends that the trial court violated the confrontation clause of the Sixth Amendment to the United States Constitution by ruling that S.G.'s utterances to Officer Clements were nontestimonial and thus admissible. This is so, he asserts, because the primary purpose of the exchange between Officer Clements and S.G. was to create an out-of-court substitute for trial testimony. We disagree.

We review de novo an alleged violation of the confrontation clause. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009). The confrontation clause bars the admission of "testimonial" hearsay in criminal trials unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. U.S. CONST. amend. VI; Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The United States Supreme Court declined to define "testimonial" in Crawford[2] but an important factor is "'the declarant's awareness or expectation that his or her statements may later be used at a trial.'" United States v. Marguet-Pillado, 560 F.3d 1078, 1085 (9th Cir. 2009) (quoting United States v. Larson, 460 F.3d 1200, 1213 (9th Cir. 2006)).

Subsequent case law has determined that a statement is testimonial when, "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'"

---

[2] "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" Crawford, 541 U.S. at 68.

Ohio v. Clark, ___ U.S. ___, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015) (alteration in original) (quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). "[T]he relevant inquiry *is not the subjective or actual purpose of the individuals involved* in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Bryant, 562 U.S. at 360 (emphasis added).

When "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." Bryant, 562 U.S. at 358. But "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry." Bryant, 562 U.S. at 374. Rather, "whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." Bryant, 562 U.S. at 366. Additional factors include "'the informality of the situation and the interrogation,'" as well as the age of the declarant. Clark, 135 S. Ct. at 2180-82 (quoting Bryant, 562 U.S. at 377).

Here, neither party disputes that S.G. was unavailable to testify or that Streepy had no prior opportunity to cross-examine him. Thus, the sole issue is whether S.G.'s utterances to Officer Clements were testimonial.

Police arrived at the apartment while Streepy was actively assaulting J.G. The officers could hear Streepy yelling from outside of the apartment but could not physically see what was happening inside. The officers questioned Streepy

upon arrival but Streepy was irate in responding to the officers and had to be handcuffed for the officers' safety. When Officer Clements entered the apartment, he asked J.G. and her seven-year-old son what had happened. The statements that S.G. made to Officer Clements contributed to the officer's knowledge of probable cause to arrest Streepy and thus prevented the assault from recommencing. As ascertained from the statements that S.G. made and the circumstances surrounding the utterances, objectively viewed, a reasonable child in S.G.'s positon would not have made such statements for the *primary* purpose of providing an out-of-court substitute for trial testimony.

S.G.'s age lends credence to the conclusion that his statements were nontestimonial. Indeed, as the United States Supreme Court recognized in Clark,

> [The declarant's] age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system. Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." Brief for American Profession Society on the Abuse of Children as *Amicus Curiae* 7, and n. 5 (collecting sources). And Clark does not dispute those findings. Thus, it is extremely unlikely that a 3-year-old child in [the declarant's] position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all.

135 S. Ct. at 2181-82.

For the purpose of viewing the encounter objectively, we see little difference between the preschooler discussed in Clark and the terrorized seven-year-old here at issue.

-7-

For his part, Streepy misapprehends the relevant inquiry and focuses solely on whether there was an ongoing emergency when Officer Clements first spoke with S.G. Streepy contends that there was no ongoing emergency because (1) S.G. was describing *past* events, rather than events *currently* unfolding, (2) police had already handcuffed Streepy by the time that S.G. spoke to Officer Clements, and (3) S.G.'s statements were not necessary to resolve any emergency.[3]

Streepy's assertions are without merit. Streepy was irate when police arrived at the apartment and his demeanor did not improve during the encounter. Officer Clements questioned S.G. mere moments after interrupting the ongoing crime and, although the questions and answers were grammatically in the past-tense, "the statements were made contemporaneously with the events described." State v. Ohlson, 162 Wn. 2d 1, 17, 168 P.3d 1273 (2007) (citing Davis v. Washington, 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). The fact that Streepy had already been placed in handcuffs likewise does not establish that the emergency had ended. Officer Clements testified that it was not until *after* questioning J.G. and S.G. that he had probable cause to arrest Streepy. Streepy was placed in handcuffs prior to being arrested solely for

---

[3] Streepy also inexplicably asserts that, because the questioning took place inside the apartment, "with his mother by his side," the exchange was a formal interrogation. Br. of Appellant at 18. He cites to our decision in State v. Reed, 168 Wn. App. 553, 564, 278 P.3d 203 (2012) ("[D]isorganized questioning in an exposed, public area that is neither tranquil nor safe tends to indicate the presence of an ongoing emergency."). Streepy's contention—that the scene of a violent assault interrupted by police presence somehow constitutes a tranquil and safe environment—is unavailing. Moreover, any secondary purpose that Officer Clements may have had in eliciting the statements from S.G. is immaterial so long as the primary purpose that a reasonable participant in S.G.'s position, considering all of the facts, would have had was other than to create an out-of-court substitute for trial testimony. Clark, 135 S. Ct. at 2180.

the officers' safety. J.G. and S.G. were not safe, and the emergency was not resolved, until the officers actually arrested Streepy.

Viewed properly, the primary purpose of the challenged utterances was other than to create an out-of-court substitute for trial testimony. Clark, 135 S. Ct. at 2180. Thus, the utterances were not testimonial. Accordingly, no confrontation clause violation is established.

III

Streepy next contends that the trial court violated his right to confrontation when it prohibited him from cross-examining J.G. regarding her immigration status. This is so, he asserts, because such evidence was relevant to J.G.'s motivation as a witness. Streepy is wrong.

We review a trial court's limitation of the scope of cross-examination for an abuse of discretion. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). We may affirm a trial court's decision as to the admissibility of evidence on any basis supported by the record. State v. Norlin, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998).

Both the federal and state constitutions guarantee a criminal defendant the right to confrontation, including the right to conduct a meaningful cross-examination of adverse witnesses. U.S. CONST. amend VI; CONST. art. I, § 22; Darden, 145 Wn.2d at 620. But the right to cross-examine adverse witnesses is not absolute. Darden, 145 Wn.2d at 620-21 ("The confrontation right and

No. 74745-2-I/10

associated cross-examination are limited by general considerations of relevance." (citing ER 401, ER 403)). "Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Here, Streepy sought to cross-examine J.G. regarding her immigration status and knowledge of a U visa. A U visa provides undocumented immigrants who are victims of certain crimes with temporary protection from removal.[4] Streepy argued that J.G.'s immigration status was relevant to her motivation as a witness.

The trial court allowed Streepy to make an offer of proof in the form of testimony from J.G. J.G. testified that she was not a U.S. citizen or a lawful permanent resident. J.G. testified that she was granted deferred action for childhood arrivals (DACA) status. J.G. testified that she was informed of the U visa in group therapy. J.G. testified that she was aware that by alleging a criminal offense she may be eligible for a U visa. J.G. also testified that she had not started filling out paperwork for the U visa, had not contacted immigration to go forward with a U visa application, and had decided to not apply for the U visa in light of her DACA status.

---

[4] See Victims of Criminal Activity: U Nonimmigrant Status, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status#Applying%20for%20U%20Nonimmigrant%20Status%20(U%20Visa) [https://perma.cc/J9BG-KYU7].

The trial court then directly asked J.G. when she first learned of the U visa program. J.G. testified that she heard of the U visa at her first group therapy meeting, after Streepy's arrest. J.G. testified that she obtained DACA status in 2013 and that, based on her understanding of the DACA program, she was lawfully in the United States.

Based on J.G.'s testimony, the trial court found that J.G. was not aware of the U visa program at the time of the incidents that gave rise to the charges against Streepy. The trial court found that J.G. had decided against pursuing the U visa program and that "the inference would be that she already has lawful status here for the present time under the DACA program."

The trial court found that evidence of J.G.'s immigration status was minimally relevant. The trial court found that the U visa program was not something that would have affected the way in which J.G. interacted with the police, so it was not relevant in that regard. The trial court found that the evidence was minimally relevant because "theoretically this could possibly affect the testimony that she gives here at trial and could possibly have some effect with regard to the issue of bias." Nevertheless, the trial court ultimately determined that the risk of prejudice far outweighed the relevancy of the evidence.

The trial court's characterization of the evidence as "minimally relevant" was generous. To the contrary, evidence of J.G.'s immigration status was not at all relevant under these circumstances.

- 11 -

The only evidence in the record relating to J.G.'s knowledge of the U visa program establishes that J.G. was unaware of the program when she telephoned 911 and—minutes later—made statements to the police. Accordingly, J.G. could not—at that time—have been motivated to make false allegations against Streepy in order to obtain a U visa.

J.G.'s immigration status remained irrelevant absent some indication that she planned to offer trial testimony that differed from the statements that she had made to the police upon Streepy's arrest. Because no such indication existed— and because J.G.'s testimony at trial *was* consistent with the statements that she made to the police—there was no logical connection between J.G.'s testimony and her learning of the U visa program. Thus, J.G.'s immigration status does not make the existence of any fact that is of consequence to the jury's determination more probable or less probable than it would be without the evidence. ER 401. Accordingly, the evidence was not relevant and was, thus, properly excluded.

Moreover, the fact that J.G. honored her obligation to testify, and told the jury the same things that she told the officers at the scene, did not provide fodder for impeachment. There was nothing in the offer of proof that would have tended to prove that J.G. would have absconded from trial or recanted her testimony had she been unaware of the U visa program.

Nevertheless, Streepy contends that the trial court misapprehended the nature of J.G.'s DACA status and would have ruled differently had it fully

understood that J.G. could still face deportation.[5] Streepy asserts that the trial court should have taken judicial notice of the DACA so as to better understand how the program functions.

This contention abjectly fails. Whether J.G. *actually* resided in the United States lawfully was immaterial. Rather, it was J.G.'s *subjective belief* that was determinative. Because J.G. herself *believed* that she resided in the United States lawfully, she had no motivation to provide false or exaggerated testimony for purposes of avoiding deportation or securing a U visa. Thus, it is immaterial how the trial court would have ruled had it possessed a different understanding of the DACA program.

We may affirm the trial court's ruling on any basis supported by the record. Norlin, 134 Wn.2d at 582. Because evidence of J.G.'s immigration status was not relevant, we conclude that the trial court did not abuse its discretion by excluding the evidence.[6]

IV

Streepy next contends that he received ineffective assistance of counsel because his counsel failed to request an Old Chief[7] stipulation.

Constitutionally ineffective assistance of counsel is established only when the defendant shows that (1) counsel's performance, when considered in light of

---

[5] The trial court remarked that "if we were dealing with a situation where the alleged victim was illegally in this country, was in danger of deportation, I would permit this cross-examination to occur."

[6] Streepy also contends that he received ineffective assistance of counsel because his counsel failed to request that the trial court take judicial notice of the DACA. Because taking judicial notice of the DACA would not have changed the relevancy of J.G.'s immigration status, this contention also fails.

[7] Old Chief v. United States, 519 U.S. 172, 191, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

all the circumstances, fell below an objectively reasonable standard of performance, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hassan, 151 Wn. App. 209, 216-17, 211 P.3d 441 (2009). The burden is on the defendant to demonstrate deficient representation and prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015). Failing to satisfy either part of this analysis ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

"Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). "[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

In Old Chief v. United States, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), the United States Supreme Court recognized the prejudicial effect that evidence of a defendant's prior conviction may have on the trial. Accordingly, the Court announced that a trial court abuses its discretion when it fails to accept a defendant's stipulation to a prior conviction upon the defendant's request. State v. Humphries, 181 Wn.2d 708, 717, 336 P.3d 1121 (2014) (citing Old Chief, 519 U.S. at 174). "The most the jury needs to know is that the

conviction admitted by the defendant falls within the class of crimes that [the legislature] thought should bar a convict from possessing a gun." Old Chief, 519 U.S. at 190-91.

Here, the State charged Streepy with four counts of unlawful possession of a firearm in the second degree. Pursuant to RCW 9.41.040(2)(a)(i), a person is guilty of unlawful possession of a firearm in the second degree if that person owns a firearm and has been previously convicted of assault in the fourth degree committed by one family or household member against another. Streepy had one such conviction.

Counsel for Streepy initially intended to offer an Old Chief stipulation as to the prior conviction. However, before trial began, the trial court asked counsel to confirm that Streepy was stipulating to the prior conviction. Counsel for Streepy then expressly declined to stipulate to the prior offense.

> [Defense counsel]: Your Honor, I think at this point I would not be making such—I'm not going to be requesting an Old Chief stipulation. I think that, based on what the jury has already heard, I don't think that it would serve any purpose from our perspective so I'm not going to be requesting that. [8]
> The Court: Just for purposes of clarification, by an Old Chief instruction, you're referring to an instruction that would simply tell the jury that it is agreed or stipulated that Mr. Streepy has the assault fourth degree-domestic violence conviction, or something to that effect, so that the state would not need to present the certified copy of the Judgment and Sentence in that regard?
> [Defense counsel]: That's correct, Your Honor. I see no purpose from my perspective in requesting such a stipulation.

---

[8] It is not clear from the record "what the jury has already heard." This exchange occurred outside of the presence of the jury before voir dire had been completed. No reference to the prior conviction had been made to the prospective jurors.

Because Streepy declined to stipulate to the prior offense, the State was forced to prove that the offense had been committed. To do so, the State obtained a certified copy of a judgment and sentence document—from the neighboring county in which the offense was committed—and offered that document at trial to prove the prior conviction. The judgment and sentence document was admitted, over Streepy's objection. The trial court issued a proper limiting instruction. No other details of the prior offense were elicited.

After the State rested its case in chief, the prosecutor noticed that the judgment and sentence document did not list the date of the offense—a crucial element of the State's case.[9] This fatal flaw in the State's evidence forced the State to move to reopen its case in chief, a request granted by the trial court over Streepy's objection.

The State proposed obtaining a certified copy of the statement of defendant on plea of guilty for the prior offense in order to prove the date of the offense. The trial court then asked defense counsel if Streepy would stipulate to the date of the offense so that the State did not have to go through the process of obtaining the certified document. Streepy declined to so stipulate. The trial court recessed the trial and the State soon obtained a certified copy of the document from the neighboring county and sought to admit the document at trial. Again, Streepy objected. The trial court overruled the objection and admitted the document into evidence.

---

[9] The jury instruction required the jury to find that the prior offense was committed on or after July 1, 1993.

Taking all of this into consideration, there was a conceivable strategic reason for Streepy's counsel to decline to stipulate to the prior conviction. The record establishes that the judgment and sentence document initially relied on by the State was incomplete and therefore insufficient to prove a crucial element of the charged crimes. The record also establishes that defense counsel interposed challenges to the State's reliance on this document, objecting to its admission. Because the evidence relied on by the State failed to satisfy a crucial element of the charged crimes, the State was required to obtain a certified copy of the statement of defendant on plea of guilty during the trial court's recess. Had the State failed to do so, Streepy would have argued that the State had failed to prove every element of the charged crimes. Streepy's attorney chose to put the State to its proof, having a reasonable belief that the prosecution might fail to properly prove the prior conviction. The fact that this tactic did not, in the end, succeed does not make it any less tactical. Streepy did not receive ineffective assistance of counsel.[10]

## V

Finally, Streepy contends, and the State concedes, that resentencing is necessary because the trial court erroneously concluded that attempted assault in the second degree and felony harassment did not, in these circumstances, encompass the same criminal conduct for purposes of calculating his offender score. We accept the State's concession and remand for resentencing.

---

[10] Streepy also contends that cumulative error deprived him of a fair trial. Because we find no error, Streepy's claim fails.

- 17 -

Remanded for resentencing, affirmed in all other respects.

We concur:

_Dwyer, J._

_Trickey, ACJ_

_Appelwick, J._