# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48454-4-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| LEONEL ROMERO-OCHOA, | |
| Appellant. | |

BJORGEN, C.J. — Leonel Romero-Ochoa appeals from his convictions of two counts of first degree rape and one count each of first degree burglary, unlawful imprisonment, and second degree assault. He asserts that the trial court's ruling excluding evidence of the victim's pending U-visa application[1] violated his right to present a defense and his right to confront witnesses. Ochoa also appeals from his sentence, asserting that the trial court erred by failing to treat his first degree rape and second degree assault convictions as the same criminal conduct when calculating his offender score.

We hold that the trial court's ruling excluding evidence of the victim's pending U-visa application violated Ochoa's Sixth Amendment rights to present a defense and confront witnesses. We also hold that these violations were harmless beyond a reasonable doubt only as they related to his unlawful imprisonment conviction. Therefore, we affirm Ochoa's unlawful

---

[1] A U-visa permits victims of certain crimes to lawfully reside in the United States for four years, which may be extended upon certification that the victim's continued presence is required to assist in the investigation or prosecution of criminal activity. *See* 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6).

imprisonment conviction and reverse and remand for a new trial on his remaining convictions. With this, we need not examine his claim of sentencing error.

FACTS

In July 2014, Victoria Isidor Cordero lived with her five-year-old daughter in a mobile home park in Lakewood. Ochoa's brother also lived at the same Lakewood mobile home park; Ochoa previously lived there. On July 3, Isidor came home from work and went to sleep at around 11:40 p.m. The window in Isidor's bedroom did not have a functioning latch.

According to Isidor, she awoke to a noise at around 3 a.m. and saw a man she did not recognize standing next to her bed. Isidor later identified the man as Ochoa. Ochoa told Isidor, "Just be quiet. Don't say anything." Report of Proceedings (RP) (Oct. 20, 2015) at 9. Isidor ran out of her bedroom and attempted to open her front door, but Ochoa grabbed and choked her before she could escape. Ochoa forced Isidor onto a couch, removed her clothing, and vaginally raped her. During this time, Isidor screamed for help while Ochoa told her to be quiet, repeatedly slapped her in the face, and covered her mouth.

Isidor stated that she could smell alcohol on the Ochoa's breath and thought that she might be able to escape by offering him a beer. Ochoa accepted Isidor's offer and led her to the refrigerator while grabbing on to her hair. When Ochoa released Isidor to take the beer from her, Isidor ran out of her home and screamed for help. Ochoa grabbed Isidor by her hair, hit her twice in the face, dragged her back into her home, and raped her a second time.

Police eventually arrived and arrested Ochoa. While speaking with police, Isidor realized that she had previously seen Ochoa around the mobile home park and at a birthday party for her daughter. Isidor denied having any previous relationship with Ochoa.

According to Ochoa, he and Isidor began a secret sexual relationship in 2010, while both were still married to other people. Ochoa stated that he had ended the relationship in 2013 because he knew it was wrong and because he did not want others to discover their affair. On July 3, Ochoa visited his brother at the Lakewood mobile home park. Ochoa stated that he left his brother's home at around 2:15 a.m. and started walking to a nearby gas station. As he was walking, he heard Isidor calling to him from her bedroom window. Isidor asked him to come in through the window and not to open the front door. They then went to Isidor's living room and began talking about their previous relationship. Ochoa and Isidor began to have consensual sexual intercourse on the couch and, at some point, the two fell to the floor. Ochoa said that he did not want to continue to have sex after they fell on the floor.

Ochoa stated that Isidor's emotional state suddenly changed after he declined to continue having sex with her. Isidor became angry and said, "Don't you love or like me anymore? Because you're different, you don't want to be with me. I feel you're different." RP (Oct. 26, 2015) at 20. Ochoa asked Isidor to be "more understanding" and told her that "not everything is [about] sex." RP (Oct. 26, 2015) at 20-21. Isidor then became "hysterical," mussed up her hair, and started grabbing at her own face. RP (Oct. 26, 2015) at 21. Ochoa asked Isidor for a beer. Isidor grabbed a beer, threw it at Ochoa, and ran out the door. Isidor began screaming that Ochoa did not love her anymore, after which Ochoa grabbed her and convinced her to come back inside. The two again began kissing and Ochoa was taking his pants off when the police arrived and knocked on the door. Isidor told Ochoa, "Let me go get the door because it's the police, and if I don't open, they'll knock open the door." RP (Oct. 26, 2015) at 23. Isidor then "started again acting up" and ran out the door. RP (Oct. 26, 2015) at 23.

3

The State charged Ochoa with four counts of first degree rape, first degree burglary, first degree kidnapping, and second degree assault. The matter proceeded to a jury trial.

Before trial, the State moved to exclude evidence of Isidor's immigration status. In regard to the State's motion, Ochoa's counsel stated at a pretrial hearing:

> The alleged victim in this case is not a legal immigrant in the United States, and as a result of, I believe, this case, has filed a petition to be granted, let's say, a hardship permission to remain in the country and to get a protected status so she will not be deported.
>      And so, Your Honor, our position is that that is one of the bases for her to make up this allegation. My client's position is that this was a consensual thing, that he had had a consensual relationship with her in the past, so she is doing this to protect her from being thrown out of the country and is raising this as a way to remain in the country.

RP (Oct. 12, 2015) at 20. The trial court indicated that it would take the matter under advisement.

The parties again discussed the State's motion to exclude at subsequent pretrial hearings. Defense counsel stated that Ochoa sought to elicit evidence that Isidor (1) had previously applied for a U-visa as an alleged crime victim in a separate matter and (2) was in the process of applying for a U-visa with respect to this matter. Defense counsel stated that Isidor had submitted U-visa application paperwork to the prosecutor's office, but "the prosecutor's office says they won't sign off on the paperwork until the proceedings are completed." RP (Oct. 14, 2015) at 91. The trial court ruled that evidence of Isidor's prior attempt to receive a U-visa was not admissible at trial.[2] The trial court reserved ruling on the admissibility of Isidor's pending U-visa application.

---

[2] Ochoa does not appear to challenge the trial court's ruling excluding evidence of Isidor's prior U-visa application.

4

After the jury was selected, the trial court ruled that evidence of Isidor's pending U-visa

application was not admissible, stating:

> I think once you start bringing in the issue of immigration status, it becomes a very slippery slope. And given the emotional reactions one way or another, which we saw during voir dire—I can't remember the juror's number, No. 9 perhaps—the guy sitting in the front clear to my left was extremely emotional when we started talking about the immigration policy in this country.
> I just am concerned about the inflammatory effect of that kind of evidence, and I'm going to exclude any evidence of the U visa or anything else about immigration of either parties, any of the witnesses. And that's my ruling.
> . . . .
> There is certainly—there are two sides to this debate, but I am convinced, not just sort of on a macro view of how people react to the immigration debate in this country, whether there should be amnesty or whether everybody that is not documented in some form or another needs to be packed up and shipped back where they came from, those are the sort of opposite poles of the debate. People fall in between.
> But even in this venire on questioning—and I let you question the venire quite extensively, [defense counsel], relate to this—there were emotional reactions of sufficient severity and intensity that I believe that bringing up immigration and going into the status of any of the people that are going to be testifying in this case is going to inflame one way or another the jury so that their view of the case is going to be driven not by the evidence, but by their personal views about immigration and immigration policy and what should or shouldn't happen to those who are in this country without proper documentation. So that's it.

RP (Oct. 19, 2015) at 28-30.

At trial, Isidor and Ochoa testified consistently with the facts as stated above. Several

witnesses who lived at the Lakewood mobile home park also testified at trial. Elizabeth Guillen

testified that she had awakened to the sounds of a female voice screaming at around 3 or 4 a.m.

Guillen stated that she called 911 after hearing the female screaming for help in both English and

Spanish. After police arrived, Guillen heard Ochoa call out to Isidor, "[M]y love, why are you

doing this?" RP (Oct. 19, 2015) at 105. Guillen's husband, Rafael Guillen-Gonzalez, testified

that he had looked out the window after hearing screaming and saw Ochoa dragging Isidor by the

hair for about 15 feet and then into her house. The mobile home park manager testified that he had called the police after hearing a female voice screaming for help.

Lakewood Police Officer Ryan Moody testified that he responded to the scene and knocked on Isidor's door but did not receive a response. Moody stated that a short time later Isidor ran out the door naked from the waist down and that she appeared upset and frightened. Moody said that he saw Ochoa standing inside the residence and "noticed that he didn't have any pants on. He just kind of appeared shaky, wasn't very sturdy on his feet, [and] kind of had a glazed-over look in his eyes." RP (Oct. 19, 2015) at 59.

Dr. Jaime Delcampo testified that he had treated Isidor in the emergency room. Delcampo stated that Isidor had visible bruising on her face, along her jaw, and on her neck, swelling on her left wrist, and tenderness and bleeding within her vagina. Mandy Graham, an emergency room nurse, testified that Isidor had bruising behind her left ear, multiple scratches to her face and neck, scratch marks on her knees and knuckles, and bruises on her upper left arm, right hand, left inner thigh, and lower legs.

After Ochoa testified for the defense, Isidor's sister, Deici Isidor, testified in rebuttal. Deici testified that she had never seen Isidor with Ochoa and that Isidor never mentioned being in any relationship with Ochoa.

The jury returned verdicts finding Ochoa guilty of two counts of first degree rape, two counts of second degree rape as inferior degree crimes to two of the first degree rape charges, first degree burglary, unlawful imprisonment as a lesser-included crime to the second degree kidnapping charge, and second degree assault.[3]

---

[3] The jury also returned several special verdicts that are not at issue in this appeal.

6

No. 48454-4-II

At sentencing, the trial court accepted the State's concession that Ochoa's second degree rape convictions merged with his first degree rape convictions. The trial court also found that Ochoa's unlawful imprisonment conviction constituted the same criminal conduct for sentencing purposes as his first degree rape convictions. The trial court, however, rejected Ochoa's argument that his second degree assault conviction constituted the same criminal conduct as his rape convictions, reasoning:

> [T]he Assault in the Second Degree conviction wasn't necessary to prove the element of Rape in the First Degree. That was proven by the unlawful entry, not based on causing serious bodily harm to the victim. In fact, there was evidence that after the forensic examination following the assault that there were marks on the victim's neck and it seemed that a strangulation did take place as a separate crime, and it was not necessary to prove strangulation in support of the Rape First Degree conviction.
> . . . .
> I distinguish this from the unlawful imprisonment, which basically is the restraint of liberty or a holding of the victim down for the purpose of accomplishing a rape, which is sort of part and parcel of the whole thing.
> Strangulation is not necessary to accomplish unlawful imprisonment or forcible rape and is a separate and distinct act that was found by the jury to have occurred, and that's what supported the Assault in the Second Degree conviction. So I don't think it is the same criminal conduct, and the offenses don't merge. So that one will be sentenced separately.

RP (Dec. 18, 2015) at 18, 20-21. Ochoa appeals from his convictions and resulting sentence.

ANALYSIS

SIXTH AMENDMENT RIGHT TO PRESENT A DEFENSE AND CONFRONT WITNESSES

Ochoa contends that the trial court's ruling excluding evidence of Isidor's pending U-visa application violated his Sixth Amendment rights to present a defense and to confront witnesses. We agree, reverse Ochoa's convictions other than that of unlawful imprisonment, and remand for a new trial.

A.    Legal Principles and Standard of Review

7

A defendant in a criminal trial has a constitutional right to present a defense. *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "The right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions." *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002).

We review a claim under the Sixth Amendment involving the right to present a defense or to confront witnesses through a three-step test. First, the evidence that a defendant desires to introduce "must be of at least minimal relevance." *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Darden*, 145 Wn.2d at 622). A defendant only has a right to present evidence that is relevant. *Id.*; ER 401. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Second, if the defendant establishes the minimal relevance of the evidence sought to be presented, the burden shifts to the State "'to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" *Jones*, 168 Wn.2d at 720 (quoting *Darden*, 145

8

Wn.2d at 622). Third, the State's interest in excluding prejudicial evidence must be balanced against the defendant's need for the information sought, and relevant information can be withheld only if the State's interest outweighs the defendant's need. *Id.* Where a defendant seeks to present evidence "of *high* probative value 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const[itution] Art[icle] 1 § 22.'" *Jones*, 168 Wn.2d at 720 (quoting *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)). With regard to the right to confront and cross-examine witnesses, "the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, credibility, or foundational matters." *Darden*, 145 Wn.2d at 619.

We review constitutional issues de novo. *State v. Armstrong*, 188 Wn.2d 333, 339, 394 P.3d 373 (2017). Consistently with that principle, our Supreme Court has held that we review de novo a defendant's claim that his Sixth Amendment right to present a defense was violated. *Jones*, 168 Wn.2d at 719.

On the other hand, we generally review a trial court's evidentiary rulings for an abuse of discretion. *State v. Strizheus*, 163 Wn. App. 820, 829, 262 P.3d 100 (2011); *see also State v. Lee*, 188 Wn.2d 473, 488-489, 396 P.3d 316, 323-24 (2017); *Darden*, 145 Wn.2d at 619. A court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). Such is the case when the superior court relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Id.* at 284.

We need not attempt to sort out how these two standards of review are applied where the defendant alleges a violation of the rights to present a defense and to confront witnesses based on the exclusion of evidence. For the following reasons, the exclusion of the U-visa was erroneous under either standard of review.

B.        Evidence of Isidor's Pending U-visa Application Was Relevant

The trial court assumed that evidence of Isidor's pending U-visa application met the threshold of relevance under ER 401 but excluded the evidence on the basis of its prejudicial effect. The State does not appear to contest the relevance of this evidence on appeal.[4] Nonetheless, we briefly discuss the nature of the U-visa program and how Isidor's pending U-visa application was relevant under the facts of the case.

A U-visa permits victims of certain crimes, including sexual assault, to lawfully reside in the United States for a period of four years, which period may be extended upon certification that the victim's continued "presence in the United States is required to assist in the investigation or prosecution of such criminal activity." *See* 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6). If the crime victim is physically present in the United States for three years following the receipt of a U-visa, her status may be adjusted to that of a lawful permanent resident. *See* 8 U.S.C. § 1255(m). To meet the qualifications for a U-visa,

> an applicant must demonstrate that she (i) has suffered substantial physical or mental abuse as the result of having been the victim of qualifying criminal activity; (ii) possesses information concerning the qualifying criminal activity; and (iii) has been helpful, is being helpful or is likely to be helpful in investigating or prosecuting the qualifying criminal activity.

---

[4] Although the State does not expressly concede on appeal that evidence of Isidor's pending U-Visa application was relevant, it presents no argument on the matter.

*Romero-Hernandez v. District of Columbia*, 141 F.Supp.3d 29 (D.C. Cir 2015) (citing 8 U.S.C. § 1101(a)(15)(U)(i)(I)-(III)); *see also* 8 C.F.R. § 214.14(b).

The trial court was presented with documentation that Isidor was in the process of applying for a U-visa in relation to this matter and had requested the prosecutor's office to certify that she had been cooperative in its investigation for purposes of obtaining a U-visa. The prosecutor's office refused to make this certification until these proceedings were concluded. *See* RP (Oct. 15, 2015) at 75. In *State v. Lubers*, 81 Wn. App. 614, 623, 915 P.2d 1157 (1996), we held that "[e]vidence of bias and interest is relevant to a witness's credibility." Thus, this evidence was clearly relevant to challenge Isidor's credibility, as it tended to show her potential bias and supplied a motive to fabricate the allegations against Ochoa.[5] Thus, evidence of Isidor's pending U-visa application was at least minimally relevant.

C.     The State Failed to Show That the U-visa Evidence Was Unduly Prejudicial

We turn next to the second and third prongs of the three-step test described above: whether the State met its burden to show that the excluded evidence was "so prejudicial as to disrupt the fairness of the fact-finding process at trial," and whether the State's interest in excluding the evidence outweighed the defendant's need for it.

---

[5] In *State v. Streepy*, 199 Wn. App. 487, 400 P.3d 339, *review denied*, ____ P.3d ___ (2017), Division One of this court held that the trial court did not err in excluding evidence of the victim's immigration status, concluding that the evidence was not relevant. *Streepy*, 199 Wn. App. at 500. There, the alleged crime victim was unaware of the U-visa program until after the defendant's arrest, and she had decided against pursing the U-visa program. *Streepy*, 199 Wn. App. at 499. The facts here are clearly distinguishable, since the defense had made an offer of proof tending to show that Isidor was aware of the U-visa program prior to making her allegations against Ochoa and was in the process of applying for a U-visa during the prosecution.

11

Contrary to the State's argument on appeal, evidence of Isidor's pending U-visa application was highly probative impeachment evidence. Ochoa did not deny that he had entered Isidor's home and that he engaged in sexual intercourse with her. Instead, he asserted a defense of consent, which required the jury to weigh his credibility against that of Isidor. Therefore, evidence tending to show Isidor's bias, attacking her credibility, and supplying a motive to fabricate the allegations against Ochoa was crucial to his defense. Isidor's pending U-visa application constituted such evidence. A jury could infer that the requirements of receiving a U-visa, particularly the requirement of providing helpful assistance in a criminal investigation, and the value of receiving permanent legal resident status through the U-visa program supplied a motive for Isidor to fabricate or embellish the allegations against Ochoa.

We further hold that the prejudicial nature of Isidor's pending U-visa application did not outweigh its high probative value. In reaching this determination, we find persuasive the reasoning in *Romero-Perez v. Commonwealth of Kentucky*, 492 S.W.3d 902 (2016). There, the Kentucky Court of Appeals stated:

> While some prejudice might result from allowing examination into the U-Visa application, we believe a criminal defendant's constitutional right to confront his accuser must prevail in this instance.
> . . . .
> It is true that a witness' immigration status could trigger negative sentiments in the minds of some jurors. In this case, any prejudice that might result from the jury knowing the victim's immigration status must be weighed against [the defendant's] right to effective cross-examination.
> . . . .
> The value of [qualifying U-visa] status for those living in immigration limbo cannot be overstated. The ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to leave the United States, *could* provide a strong motive for fabrication or embellishment.

> Given the nature of the U-Visa program, we must conclude that a criminal defendant's right to effectively probe into a matter directly bearing on witness credibility and bias must trump any prejudice that would result from the jury's knowledge of the victim's immigration status. The probative value of disclosing the immigration status and knowledge of the U-Visa program outweighs any prejudice to the witness stemming from such disclosure.

*Romero-Perez*, 492 S.W.3d at 906-07.

In reaching this conclusion, we do not accept the State's suggestion that discussions about immigration during jury selection justified the trial court's exclusion of this evidence. While some potential jurors expressed differing and sometimes strong opinions regarding immigration in this country, none of the comments were inflammatory or suggested that potential jurors could not fairly apply the law to the facts in light of the defendant's or a witness's immigration status. In addition, one purpose of the jury selection process is to identify potential jurors who "cannot try the issue impartially and without prejudice" and thus would be subject to for-cause dismissal. RCW 4.44.170(2); CrR 6.4(b), (c). The failure to challenge sworn jury members for cause based on an inability to set aside any prejudices with regard to immigration matters suggests that any prejudice to Isidore due to her immigration status was not significant.

Accordingly, we conclude (1) that the State failed to show that disclosure of Isidor's pending U-visa application was "so prejudicial as to disrupt the fairness of the fact-finding process at trial," and (2) that the defendant's need for this evidence outweighed the State's interest in its exclusion. Thus, under either standard of review the trial court's ruling excluding evidence of Isidor's pending U-visa application violated Ochoa's Sixth Amendment rights to present a defense and to confront witnesses.[6]

---

[6] We note the pending new rule, ER 413, on immigration status, and the Supreme Court's

D.        Constitutional Harmless Error Analysis

Errors of constitutional magnitude, including violations of a criminal defendant's Sixth Amendment rights to present a defense and to confront witnesses, may be deemed harmless beyond a reasonable doubt. *Jones*, 168 Wn.2d at 724 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). "[E]ven a constitutional error does not require reversal if, beyond a reasonable doubt, the untainted evidence is so overwhelming that a reasonable jury would have reached the same result in the absence of the error." *State v. Saunders*, 120 Wn. App. 800, 813, 86 P.3d 232 (2004). We presume constitutional errors to be prejudicial, and the State bears the burden of proving such errors to be harmless beyond a reasonable doubt. *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013).

In determining whether a constitutional error limiting the cross-examination of a witness for potential bias was harmless beyond a reasonable doubt, we consider several factors, which include

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

---

recognition in *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 672, 230 P.3d 583 (2010), that "immigration is a politically sensitive issue [and that i]ssues involving immigration can inspire passionate responses that carry a significant danger of interfering with the fact finder's duty to engage in reasoned deliberation." Taking each into consideration, we remain of the view that the trial court erred in excluding evidence of the U-visa for the reasons given.

With respect to all but Ochoa's unlawful imprisonment conviction, we hold that these factors weigh against a determination that the trial court's error was harmless beyond a reasonable doubt. As the alleged crime victim and the only witness to Ochoa's conduct occurring inside her trailer, Isidor's testimony was critical to the State securing its convictions against Ochoa. Isidor's testimony with regard to Ochoa's conduct inside her trailer was not cumulative to any other witness testimony and was not corroborated by any other witness. Although the State's evidence against Ochoa was strong, its strength depended entirely on the jury finding Isidor's testimony credible.

The State argues that the error in excluding evidence of the victim's pending U-visa application was harmless beyond a reasonable doubt because the viability of Ochoa's consent defense would have been weakened by evidence supporting a theory that the victim made up or embellished allegations to receive favorable immigration treatment. We fail to discern how Ochoa's consent defense would have been undermined by evidence supporting a theory that Isidor fabricated or embellished the criminal allegations. Absent evidence attacking Isidor's credibility, the jury was still left with competing versions of events from which it had to weigh Isidor's and Ochoa's credibility.

We agree with the State, however, that the trial court's error in excluding evidence of Isidor's pending U-visa application was harmless beyond a reasonable doubt with respect to Ochoa's unlawful imprisonment conviction. Isidor's testimony that, once outside her trailer,

Ochoa grabbed her by the hair and dragged her back inside was corroborated by Guillen-Gonzalez. Accordingly, the evidence supporting Ochoa's unlawful imprisonment conviction was overwhelming and would not have been significantly undermined by evidence attacking Isidor's credibility.

In summary, with respect to Ochoa's unlawful imprisonment conviction, the State has demonstrated that the trial court's error in excluding the U-visa evidence was harmless beyond a reasonable doubt. With respect to Ochoa's other convictions, the State has not demonstrated that this error was harmless beyond a reasonable doubt.

## CONCLUSION

We reverse Ochoa's convictions of two counts of first degree rape, one count of first degree burglary, and one count of second degree assault and remand for a new trial on those charges.[7] We affirm Ochoa's conviction of unlawful imprisonment because the State showed the error in excluding the evidence to be harmless beyond a reasonable doubt. Because we reverse Ochoa's

---

[7] Our holding does not suggest that the trial court on remand may not limit the scope or extent of evidence concerning Isidor's pending U-visa application or the cross-examination of such matters to reduce possible prejudice. However, consistent with Ochoa's Sixth Amendment rights, the trial court may not exclude from the jury's consideration evidence that Isidor had sought U-visa status in connection with the State's charges, the requirement that she provide helpful assistance in a criminal investigation, and the benefits of applying for a U-visa, including the possibility of receiving permanent legal resident status.

No. 48454-4-II

first degree rape and second degree assault convictions, we need not address his claimed

sentencing error with regard to those convictions.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

Bjorgen, C.J.

We concur:

Melnick, J.

Sutton, J.

17