Filed 12/27/22  P. v. Lopez CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>GABRIEL ELENA LOPEZ,<br><br>    Defendant and Appellant. | A163573<br><br>(Napa County<br>Super. Ct. No. CR169387) |

A jury convicted defendant Gabriel Elena Lopez of molesting his girlfriend's daughters, L. and J.  He was sentenced to 104 years to life in prison.  On appeal, he claims the trial court erred by denying him a continuance to investigate late-disclosed evidence that the girls' parents and J. applied for U visas, which convey temporary legal residency on crime victims and their relatives.  He also claims the court erred by excluding the U-visa evidence under Evidence Code section 352.  Finally, he claims he must be resentenced because the court relied on his decision to go to trial to select the term imposed.  We reject his claims, order a correction to the abstract of judgment, and affirm.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

*A. Background*

L. and J.'s mother (mother) was born in Mexico and later moved to Oregon, where L. was born in September 1997. Mother and L. eventually returned to Mexico, where J. was born in September 2003. Mother subsequently split up with the girls' father, who had remained in the United States.

Around 2007, mother began dating Lopez. Lopez, who was born in 1984, lived in Napa but was from the same town as mother and returned to Mexico for a few months each year. In May 2010, mother, L., and J. moved to Napa to live with Lopez. Two months later, mother and Lopez's son was born.

Initially, the family lived with Lopez's brothers, but they later moved to an apartment on Central Street in Napa. In 2012, the family moved to a two-bedroom apartment on Riverside Drive. That September, mother and Lopez's daughter was born. Lopez, mother, and the two youngest children slept in one bedroom, and L. and J. slept in the other.

Lopez worked outside the home, and mother stayed home to care for the children. She testified that she "never" left L. and J. home alone with Lopez during this period. But in the summer of 2013, mother began working the night shift at McDonald's. While she was at work, from 4:00 or 5:00 p.m. to 1:00 or 2:00 a.m., Lopez stayed with the children. L. and J. took care of the younger children, "because he didn't want to be bothered most of the time."

After the family stopped living with Lopez's brothers, Lopez became hostile toward mother, L., and J. He hit mother in front of L. and J. and threatened to take them away if she left him. Mother did not like leaving

2

them with Lopez because "he would get very angry with them, and he would scold them." He did not treat L. and J. like his daughters and "only wanted to see them sweeping and cleaning." J. testified that Lopez tried to turn her and L. against their father, telling them their father "would treat [them] really bad" if they ever went to live with him.

Lopez would also slap L. on her buttocks, making her uncomfortable. J. witnessed this behavior, and it made her uncomfortable as well. According to J., Lopez told L. "that she would end up pregnant . . . and that she wasn't going to amount to anything."

### B. Lopez's Sexual Abuse of L.

The charges involving L. stemmed from an incident on January 25, 2014, when she was 16 years old. L., who was 23 years old at the time of trial, testified that mother left for work around 5:00 p.m. that night. L. and her siblings went to sleep together in the older girls' bedroom around 10:00 p.m. All four slept on the floor, with L.'s two youngest siblings on either side of her.

At some point, L. woke up and Lopez was in the room, "[c]lose to [her]." He told her that mother "was being unfaithful to him" and "he wanted to sleep with [L.]" L. said "no" and stated it would not be "correct" to do so. Nonetheless, as L.'s siblings continued to sleep beside her, Lopez pulled down her pajama pants and underwear. L. "struggled" and again told Lopez no, but "he threatened [her] that if [she] didn't let him, then he would grab [her] sister" and "call the police so that [mother] would be deported."

L. testified that Lopez then touched the inside of her vagina and "lick[ed] it." He also used his mouth and hands to touch her breasts. Finally, he "penetrated" her vagina with his penis, which was L.'s first time having intercourse. Eventually, he left the room, and L. put her clothes back on.

3

L. also testified about earlier, uncharged incidents when Lopez taught her to drive. At least three times while they were in the car alone, Lopez touched L.'s leg and her breasts underneath her shirt. When Lopez touched L., he told her "he was doing that so [she] could relax and concentrate better [on] the driving." L. told Lopez that she did not like what he was doing, but he would not stop.

L. explained that she did not report the driving incidents at the time because she was afraid she would not be believed. At trial, mother testified that Lopez gave L. one driving lesson, but mother was nearby watching when it occurred.

C.    L. and J. Report Lopez's Conduct.

Mother testified that Lopez picked her up from work around 2:00 a.m. on January 26, the same night he raped L. Later that morning, Lopez left for the day. L. then got up and "was in a bad mood" and "was crying." Mother asked what was wrong, and L. stated Lopez had said bad things about mother and pulled down L.'s pants and underwear.

While mother and L. were talking, J. could hear some of what L. said. After speaking to L., mother asked J. whether Lopez had "ever touched [her] inappropriately." J. denied he had, although she also "said she didn't want to say anything to [mother] for fear of him." Mother encouraged her to tell the truth, at which point J. said that Lopez once "offered her money so that she would allow him to touch her wherever he wanted." Mother testified that J. had not previously mentioned Lopez doing anything to her.

Mother became "angry," but she was afraid to call the police right away because she was worried about Lopez's reaction. Instead, she waited until L. and J. went to school the following day, January 27, and got in touch with a

4

victim advocate at a local organization. The victim advocate contacted the Napa police, and mother, L., and J. went to the station to report the crimes.

### D.    *Lopez's Sexual Abuse of J.*

The same day, the police interviewed 10-year-old J., and a video recording of the interview was played for the jury.[1]  J. reported that the previous Thursday, January 23, while mother was at work, she was sitting on the couch watching TV when Lopez "kiss[ed] her cheek and . . . started to put . . . his hand on [her] butt."  Lopez told J. that if she "let him do that, like, do whatever he wants with [her]," he would pay her.  He showed her money and "kept raising the amount" he offered, starting from $1 and ending at $100.

J. told Lopez that she was his daughter, not "another girl," and removed his hand from her buttocks.  She got up from the couch and moved away from him, but he followed her and "kept on doing it."  J. could not run away because she was holding her little sister, but she "took his hand off [her] butt" again, at which point he "just got mad."  This touching occurred over her clothes.

J. recalled earlier instances of abuse as well.  The first time was in 2011, when she was seven or eight years old and lived in the Central Street apartment.  Lopez kissed her on the mouth and hugged her while she struggled.  She reported that he then told her "to shut up and not tell nobody," stating that if he got in trouble with the police, no one would pay her family's rent.  He also said that if she told anyone, he would "kill [her] mom."

J. also described an incident in early 2013, when she was nine years old, during a party for Lopez's brother.  Lopez was in his bedroom and called

---

[1] The police also interviewed L., but it appears the prosecution did not seek to introduce her interview because of her age at the time.  (See Evid. Code, § 1360 [prior statements of child-abuse victim admissible if made when victim was under 12].)

her over to retrieve a charging cable for him. He took her into a corner where "nobody could see" and "started doing what he did on [the] Thursday [before the police interview]," i.e., touching her buttocks. She ran from the room and started crying. Later that night, after L. asked what happened, J. told her. But at trial, L. could not remember if J. ever said "anything about [Lopez] doing something bad to [J.]"

J. was 17 years old at the time of trial,, and her testimony about Lopez's abuse was generally consistent with her statements to the police. At trial, she also disclosed that at the Riverside Drive apartment, Lopez made her sit on his lap and kiss him. He "would be chewing gum, and he would ask [her] to kiss him" and pass the gum into her mouth. He also put his tongue in her mouth.

### E. Subsequent Investigation and Additional Evidence of Abuse

#### 1. The pretext call

At the police's request, mother made a pretext call to Lopez after L. and J. reported the crimes. A recording of the call was played for the jury. Initially, Lopez denied doing anything to L. He said he "massaged her, that's all," but then also admitted to "yanking [him]self" while massaging her. Eventually, he confessed to having "oral sex" with L, but he repeatedly denied that they had intercourse. Lopez also denied offering J. money to let him touch her.

During the pretext call, mother arranged to meet Lopez at a nearby Target. When Lopez arrived at the store's parking lot, he was arrested.

#### 2. Lopez's Internet searches

Mother testified that she "always checked [Lopez's] cell phone," and she once saw he searched the Internet for "how to go to bed with a virgin without

6

affecting her virginity."  She gave this information to the police, prompting them to search Lopez's phone after his arrest.

The search showed that Lopez performed numerous suggestive Internet searches both before and after sexually assaulting L.  In the days leading up to January 25, he performed searches such as "Can a woman get aroused when she receives oral sex asleep?," "How to arouse a girl who is a virgin," and "How do I take my girlfriend's virginity without it hurting much?"  Around 8:00 p.m. on January 25, he searched, "[H]ow long does a woman take to orgasm when she is receiving oral sex?," and "Do men like to perform oral sex on women?"

Lopez also made telling searches around the time he raped L. and afterward.  Shortly before midnight on January 25, he performed two searches:  "Can a woman become pregnant the first time?," and "Can a woman become pregnant without ejaculating inside of her?"  And the next day, he searched, "A female virgin had sexual intercourse but did not bleed. Was there sufficient penetration?"

### 3.    Physical evidence

The clothing L. wore on the night that Lopez sexually assaulted her was collected from the family's home.  DNA testing showed Lopez's semen on the crotch portion of her underwear.  Semen was also detected on the rear waist area of L.'s pajama pants, although there was no testimony about DNA testing of that sample.

### F.    Lopez's Testimony

Lopez testified in his own defense.  He claimed he had a good, parental relationship with L. and J.  The girls would often wait outside for him to come home from work and greet him with "hugs and kisses on the cheek."  He

7

denied ever hitting mother, and he denied touching L. when teaching her to drive.

Lopez admitted entering the bedroom where the children were sleeping on January 25 and having sexual contact with L. According to him, L. was awake and gave him a hug when he approached, "[b]ecause she was a very affectionate woman." They both became aroused, and he "asked her if she wanted to be with [him]." She responded, "[Y]es, but I don't feel I'm ready," and he said they could "do some things but not have intercourse."

Lopez testified that he then orally copulated L., during which "[s]he grabbed his head" and he masturbated. But he denied that he inserted his fingers in her vagina or that he had sexual intercourse with her. Lopez could not explain his Internet searches before the rape but denied he was "thinking about [L.]" when he performed them. He admitted that his later search about "sufficient penetration" was in response to the incident, but he claimed he performed it because "when [he] masturbated, [he] ejaculated . . . on [L.'s] vagina."

As for J., Lopez denied ever kissing or touching her inappropriately. He claimed that there was never a birthday party for his brother at the family's apartment, that he never touched J.'s buttocks, and that he never transferred his gum into her mouth. He also denied threatening J. or offering her money for sexual contact.

### G.     *Procedural History*

In mid-2014, an information was filed charging Lopez with nine felony counts. As to L., Lopez was charged with one count of forcible rape, one count of sexual penetration by a foreign object, and one count of forcible oral

copulation against a minor over 14 years old.[2] As to J., Lopez was charged with two counts of forcible lewd acts upon a child under 14 years old, three counts of lewd acts upon a child under 14 years old, and one count of contact with a minor with the intent to commit a sexual offense.[3] There were also two special allegations that Lopez committed offenses against more than one victim.[4]

In January 2016, Lopez pleaded no contest to the charge of forcible rape of L. and two of the charges of non-forcible lewd acts upon J. As to the rape charge, he also admitted the special allegation that the victim was 14 years of age or older and that he committed offenses against more than one victim. The remaining counts and allegations were dismissed, and he was sentenced to 35 years to life in prison.

Lopez appealed, and in April 2018, this court reversed the judgment, holding that he was denied his right to counsel of his choice. (*People v. Lopez* (2018) 22 Cal.App.5th 40, 42–43.) On remand, Lopez withdrew his original plea, as authorized by our opinion (*id.* at p. 51), and pleaded not guilty.

After several delays, Lopez was tried in July 2021. The jury convicted him of all the charges and allegations. That September, the trial court

---

[2] These charges were brought under Penal Code section 261, subdivision (a)(2) (rape), section 289, subdivision (a)(1)(A) (sexual penetration), and former section 288a, subdivision (c)(2)(C) (oral copulation). Former section 288a was renumbered to section 287 before Lopez was convicted. (Stats. 2018, ch. 423, § 49.) All further statutory references are to the Penal Code unless otherwise noted.

[3] These charges were brought under section 288, subdivisions (a) (lewd acts) and (b)(1) (forcible lewd acts), and section 288.3, subdivision (a) (contact with minor).

[4] These allegations were made under section 667.61, subdivisions (e)(4) and (j)(2) (victim under 14 years old), and subdivisions (e)(4) and (m) (victim 14 years of age or older).

sentenced him to a total term of 104 years to life in prison. The sentence was composed of a term of 25 years to life for rape, a consecutive term of 25 years to life for sexual penetration, a concurrent term of 25 years to life for oral copulation, consecutive terms of 25 years to life for both counts of forcible lewd acts, concurrent terms of 25 years to life for each count of lewd acts, and a consecutive term of four years for contact with a minor.[5] This appeal followed.

II.
DISCUSSION

A.    *No Error Appears in the Rulings on the U-visa Evidence.*

Lopez claims the trial court violated his due process rights by denying him a continuance to investigate late-disclosed evidence that mother and J. had applied for U visas, which he argues was crucial to impeach their testimony and defend himself against the charges involving J. He also claims the court abused its discretion under Evidence Code section 352 (section 352) by excluding the U-visa evidence. We are not persuaded.

1.    Additional facts

As noted above, L. was born in Oregon, but mother and J. were born in Mexico, and they were not United States citizens. The weekend before trial, the prosecutor disclosed to the defense that mother, as well as L. and J.'s father, had submitted U-visa applications "based on their assertions that they were indirect victims" of the crimes against L. It was later clarified that the district attorney's office had this information because as part of the U-visa application process, the parents' declarations that they cooperated with

_____

[5] The abstract of judgment contains an error. The conviction on count five was for forcible lewd acts under section 288, subdivision (b)(1), but the abstract states it was for forcible rape under section 261, subdivision (a)(2). We order this error corrected in our disposition.

10

the investigation were submitted to the district attorney for certification.[6] At the time of trial, the applications were still pending.

Lopez's trial counsel stated at the next hearing that she had not "really had a chance to decide how [she] want[ed] to proceed," but the evidence might be relevant to impeach mother because "potentially . . . she received a benefit from this alleged crime." Also, counsel implied that since the application paperwork did not mention crimes against J., this suggested those allegations could be false.

The following day, the prosecution filed a motion to exclude any reference to mother's immigration status under Evidence Code sections 350, 351.4, and 352.[7] At a hearing the same day, Lopez's counsel stated she talked to her client and "it came to [her] attention" that J. also might have applied for a U visa. Although counsel did not believe the People had "been hiding evidence," she thought it was "very important to Mr. Lopez's defense" to find out whether J. had filed an application. Counsel indicated that if J. had done so, the defense would seek a continuance. The prosecutor "adamantly opposed" a continuance.

---

[6] Lopez argues in passing that "[t]he prosecutor's refusal to disclose even [mother's] application raises an inference that the full application contain[ed] evidence that does indeed suggest bias," but our record does not indicate the district attorney's office had the full application.

[7] Evidence Code section 351.4 provides that "[i]n a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." (Evid. Code, § 351.4, subd. (a).) This statute does not "[l]imit discovery in a criminal action" or prevent parties from voluntarily disclosing their immigration status to the court. (*Id.*, § 351.4, subd. (b)(2)–(3).)

The trial court found there was not currently "good cause to grant a continuance," but it wanted to learn before the jury was sworn whether J. submitted her own application. The prosecutor then obtained information that J. was later added to her parents' application but did not have a separate application. The parties and court agreed it would be appropriate to hold a hearing under Evidence Code section 402 (section 402) to question mother. Off the record, the court also tentatively ruled under section 352 that the U-visa evidence's probative value was outweighed by the risk of undue consumption of time or prejudice.

The next day, Lopez filed a motion to have "an opportunity to prepare to impeach" mother and J. with evidence that they applied for U visas and thus had a motive to help prosecute the case. At a hearing the same day, Lopez's counsel asked for a continuance to "investigate what . . . actual claims . . . were made in the application." She argued that further investigation could show that once L. reported Lopez's abuse, J. had "a motivation to make up lies about what had happened to her in order to claim her status." Counsel felt unprepared to go forward with the section 402 hearing, because she would first "want to talk to other family members who have applied for U Visas to find out if they've talked to [mother] about anything."

The prosecutor responded that "even in the light most favorable to [defense counsel's] argument," the evidence was "relevant in the very scant[est] of terms." She opined that, particularly given the physical evidence that L. was sexually assaulted, it was "quite frankly outstanding" to suggest that when J. was 10 years old she fabricated the allegations "for some sort of immigration benefit." The fact that J. was identified as an indirect victim in mother's application was not suggestive either, because mother did not write the declaration herself and it was unclear whether she

12

knew the details of what J. reported to the police. The prosecutor also noted that if J. was "motivated to gain a more favorable immigration status," she would "embellish[] her testimony and c[o]me up with a lot more details, or worse facts as it related to [Lopez]," but J. now recalled "very little detail about what actually happened."

The trial court indicated it wanted to hold a section 402 hearing to question mother about the issue. Lopez's counsel stated that she could ask mother "certain questions" but would require more time to prepare to be able to examine her fully. The prosecutor, meanwhile, argued that mother's knowledge of the U-visa process was not relevant at all. The court decided to proceed with the hearing, though it reaffirmed its tentative ruling under section 352.

At the section 402 hearing later that day, mother testified that she did not know what a U visa was until 2016, after Lopez entered his original plea and the victim advocate told her she could apply for one. She denied talking to her daughters about U visas or ways to improve the family's immigration status before they reported the crimes.

On cross-examination, mother confirmed that L. and J. were aware she was in the United States without documentation. Mother also confirmed that her application identified "the crime that . . . occurred" as "a rape . . . [of L.]," and that while it also said J. "suffered emotional trauma because of the crime that was committed against [L.]," it did not say J. was the direct victim of a crime. Mother's testimony also tended to indicate that J. never directly told her "that [J.] was, in fact, touched by [Lopez]."

During the parties' final arguments on the topic, defense counsel urged that the section 402 hearing was insufficient to protect Lopez's right to prepare a defense. Counsel argued that "because of the timing of things, we

13

had to just take [mother's] word for what she said," and further investigation could have allowed the defense "to impeach her and show that she was well aware of what a U Visa was before January 2014, had a strong incentive to try to get one, [and] had spoken to her daughters about . . . what a U Visa was, and that it was a way for them to get some kind of legal status." Counsel argued that the U-visa evidence was relevant to J.'s credibility, including because J.'s initial report to mother was much less extensive than what J. told the police.

The trial court denied the motion for a continuance and declined to admit the U-visa evidence. After stating it would assume "in the light most favorable to Mr. Lopez" that further investigation would uncover more evidence, the court concluded "that any evidence regarding a U Visa would [have] marginal impeachment value at best, given the age of the complaining victims and witnesses in this case." The court found credible mother's testimony that she did not know about U visas until 2016. It also found there was not "much of a basis for questioning the children's testimony," including because of the DNA evidence. Indeed, J. "was already eligible for a U Visa just by her familial relationship with [L.]," meaning J. did not "need to fabricate anything" about her own experience.

Given the U-visa evidence's limited value for impeachment, the trial court concluded that the evidence was inadmissible under section 352. The court explained that even if it granted a continuance and additional evidence was found, introducing the evidence "would still create a substantial risk of distracting and confusing the jury. There would have to be multiple witnesses called, experts as well, to explain the U Visa process." There was also "a danger that one or more jurors might be inclined to view either of the victims or . . . mother unfavorably if they found out that she could use her

14

standing as the victim of abuse to gain a path to legal immigration status[,] precisely the concern of Evidence Code [s]ection 351.4."

### 2. The relevance of the U-visa evidence

We begin by addressing the U-visa evidence's relevance, because we agree with Lopez that the issue is key to his claims of error in both the denial of a continuance and the ruling under section 352. We conclude the trial court did not abuse its discretion by determining the evidence had minimal probative value under the circumstances.

"Congress created U nonimmigrant status as part of the Victims of Trafficking and Violence Protection Act of 2000 . . . . The U visa program is intended to 'strengthen the ability of law enforcement agencies to detect, investigate, and prosecute [certain crimes] . . . against aliens, while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States.' " (*Perez Perez v. Wolf* (9th Cir. 2019) 943 F.3d 853, 856–857.) Victims of qualifying crimes and certain family members may apply for a U visa, which entitles holders to four years of nonimmigrant status, after which they may seek lawful permanent residence. (*Id.* at p. 857; *Cazorla v. Koch Foods of Miss., L.L.C.* (5th Cir. 2016) 838 F.3d 540, 545; 8 C.F.R. § 214.14(a)(10), (f).)

A U-visa application must include a certification that the applicant "has been helpful, is being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which [the application] is based." (8 C.F.R. § 214.14(b)(3); *Perez Perez v. Wolf, supra*, 943 F.3d at p. 857.) To obtain the certification, the applicant submits "a signed statement . . . describing the facts of the victimization" to a certifying agency, such as a district attorney's office. (8 C.F.R. § 214.14(a)(2), (c)(2)(iii); *Perez Perez*, at pp. 857–858.) The agency then certifies whether the

applicant has been helpful in the investigation or prosecution of the crimes at issue. (*Perez Perez*, at pp. 857–858.)

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The factfinder "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony," including "[t]he existence or nonexistence of a bias, interest, or other motive." (*Id.*, § 780, subd. (f).) "Relevance is a low bar," and impeachment evidence proffered by the defense need only have " 'a tendency, however slight, to demonstrate that [a witness] had a personal interest in testifying against [the defendant].' " (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1052 (*Villa*).) "The trial court has broad discretion in determining the relevance of evidence," and we review its rulings on relevance for an abuse of discretion. (*People v. Heard* (2003) 31 Cal.4th 946, 973.)

Lopez claims the trial court took the "erroneous view that the U-Visa evidence was not relevant." We agree with him that, as various decisions have found, evidence that a witness applied for a U visa is generally " 'relevant to show motive and/or bias' " and thus is relevant to the witness's credibility. (*Villa, supra*, 55 Cal.App.5th at p. 1051; *Romero-Perez v. Commonwealth* (Ky.Ct.App. 2016) 492 S.W.3d 902, 906; *State v. Del Real-Galvez* (Or.Ct.App. 2015) 346 P.3d 1289, 1292–1294; *State v. Perez* (S.C. 2018) 816 S.E.2d 550, 555.) As the Fourth District Court of Appeal noted in *Villa*, evidence that a victim "applied for a U visa as a victim of abuse in connection with [a] criminal case" and "the prosecutor's office ha[s] signed off on the application . . . would allow 'a jury [to] infer that [the victim] had a personal interest in testifying [to being] . . . a victim of sexual abuse . . . by

16

[the] defendant.' " (*Villa*, at p. 1052, italics omitted.) Similarly, evidence that a victim's family member applied for a U visa based on a crime may support the inference that the victim has "a personal interest in testifying in a manner that would help [the family member] obtain a U visa." (*Del Real-Galvez*, at p. 1293.)

Consistent with these decisions, the trial court observed that "[o]f course [if] the testifying witness . . . [is] receiving a benefit, that is relevant evidence." Thus, the court did not find the U-visa evidence was *irrelevant*. Rather, the court determined that under the circumstances, the evidence was not "highly probative" or "much of a basis for questioning the children's testimony." (See, e.g., *Villa, supra*, 55 Cal.App.5th at pp. 1052–1053 [affirming exclusion of U-visa evidence where it "didn't provide much of a basis to question [the victim's] testimony"].) As we now discuss, the court did not abuse its discretion by determining the U-visa evidence had little probative value in the context of this case.

The trial court identified several facts supporting its evaluation of the U-visa evidence. There was DNA evidence that Lopez sexually assaulted L., which was "inconsistent" with the conclusion that she falsely accused him so mother or J. could obtain a U visa. The court also found credible mother's testimony that she did not know about the U-visa program until 2016, meaning she did not have a motive to encourage J. to fabricate any allegations. And finally, J.'s memory of Lopez's conduct had worsened, which was "inconsistent with . . . [being] motivated by a bias . . . to get a U Visa granted."

Lopez argues that the U-visa evidence was in fact "highly relevant" because it potentially explained why J. "suddenly escalate[d] the gravity of her accusations." He observes that J. told mother only that he offered her

17

money to touch her, but by the following day, during the police interview, J. reported that he touched her buttocks and kissed her on the mouth. According to him, it was "possible that [mother] had time to coach [J.] to escalate her accusations with an eye toward an eventual U-Visa application," yet the trial court improperly "assumed benign explanations for everything based purely on speculation."

In challenging the trial court's reasoning, Lopez makes two main objections. First, he claims it was speculative to determine that J.'s worsened memory suggested she was not lying to obtain an immigration benefit. He claims it was "equally likely that [J.] could not recall the specifics of her allegations because they never happened" and "[t]he urgency of remembering them ended once [mother and J.] obtained their visas," which probably happened by the time of trial. But there was no dispute below that mother's and J.'s U-visa applications were still pending, and Lopez never suggested he needed a continuance to confirm that fact. In turn, if the applications were still pending and J. made up her allegations for immigration purposes, it would not make sense for her to testify at trial that she could not remember much of Lopez's conduct.

Second, Lopez claims the trial court relied on "contradictory inferences" because it "assumed *both* that . . . [mother and J.] had no knowledge of the U-Visa program *and* that they had the sophistication to know that [J.] was already eligible for a U-Visa by virtue of her relationship to [L.]" We disagree with this evaluation of the court's reasoning. The court clearly credited mother's testimony that she did not know about U visas before her daughters reported Lopez's conduct, and there was no basis to infer that J. had independent knowledge of the U-visa program when she was 10 years old. In saying J. did not need to allege her own victimization to be eligible for a U

18

visa, the court noted this was true "regardless of the amount of time given for defense investigation and inquiry into this." Thus, the court meant that even if the defense uncovered evidence that mother actually *did* know about the U-visa program in 2014, that knowledge still would not provide a motive for her to encourage J. to lie.

Had the trial court simply concluded that the U-visa evidence was not relevant, we would agree with Lopez that it erred. But the court provided a nuanced explanation for the evidence's minimal relevance for impeachment under the particular circumstances of this case. Therefore, we accept the court's relevance evaluation in now addressing Lopez's primary claims.

> 3. The trial court did not err by denying Lopez a continuance to investigate the U-visa issue.

Lopez claims the trial court violated his due process rights to present a defense and confront the witnesses against him by denying a continuance to investigate the U-visa issue. We are not persuaded.

Continuances may be granted in criminal cases "only upon a showing of good cause." (§ 1050, subd. (e).) A trial court " ' "has broad discretion to determine whether good cause exists to grant a continuance of the trial," ' " which " ' "requires a demonstration that counsel and the defendant have prepared for trial with due diligence." ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 296.) Another relevant factor is whether the continuance would be "useful" to the defendant. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003.) Where, as here, a continuance is sought to obtain more evidence, "to demonstrate the usefulness of a continuance a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*Ibid.*) Also, in determining whether good cause exists, a court must "consider the general convenience and prior commitments of all witnesses." (§ 1050, subd. (g)(1).)

19

We review the trial court's denial of a continuance for an abuse of discretion.  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)  Although a court's discretion to deny a continuance is broad, it is not unlimited.  " 'Such discretion "may not be exercised so as to deprive the defendant or [the defendant's] attorney of a reasonable opportunity to prepare." [Citation.] "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." ' "  (*People v. Riggs*, *supra*, 44 Cal.4th at p. 296; *People v. Fontana* (1982) 139 Cal.App.3d 326, 333.)  " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' "  (*Mungia*, at p. 1118.)  If the denial of a continuance was within the court's discretion, then the ruling does not violate the defendant's federal constitutional rights.  (*People v. Alexander* (2010) 49 Cal.4th 846, 935–936; *Riggs*, at p. 297; see *People v. Jenkins* (2000) 22 Cal.4th 900, 1039–1040.)

We cannot say the trial court abused its discretion in denying the continuance, given its ruling that the U-visa evidence was minimally relevant.  The most favorable evidence the defense could realistically hope to discover was that mother knew about the U-visa program before L. and J. reported the crimes.  But there was no real dispute that Lopez sexually assaulted L., making mother and J. eligible for U visas as indirect victims, so even if mother did know about the program she had no reason to encourage J. to allege abuse as well.  And while evidence that mother lied about her knowledge of U visas would negatively affect her credibility, she was not a percipient witness to Lopez's inappropriate behavior toward J.  Thus, without

20

any basis on which to conclude mother influenced J. to make a false report, evidence undermining mother's credibility was not material to Lopez's defense against the charges involving J.

Other considerations also supported the denial of a continuance. We are not persuaded that Lopez failed to exercise due diligence regarding the U-visa issue, but we agree with the Attorney General that a continuance would have burdened jurors, witnesses, and the trial court. When the defense raised the possibility of a continuance, jury selection was almost over, and delaying the trial would likely have required restarting that process. Also, by the time of trial the case had been pending for over seven years. The court could reasonably conclude, as the prosecutor argued, that continuing the trial yet again would cause emotional harm to L. and J.

In short, the trial court did not abuse its discretion by denying Lopez's request for a continuance, particularly given that further evidence about mother's knowledge of the U-visa program was minimally relevant. As a result, Lopez's constitutional claims fail as well.

4. The trial court properly excluded the U-visa evidence under section 352.

Lopez also claims the trial court abused its discretion by excluding the U-visa evidence under section 352. The claim lacks merit.

Evidence that is otherwise relevant and admissible may be excluded under section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; *People v. Scott* (2011) 52 Cal.4th 452, 490.) We review the trial court's section 352 ruling for an abuse of discretion. (*People v. Miles* (2020) 9 Cal.5th 513, 587.)

Lopez fails to show the trial court erred in balancing the U-visa evidence's probative value against countervailing considerations under section 352. On appeal, he challenges only the court's balancing of the evidence's prejudicial impact against its probative value. But the court also concluded the evidence would "create a substantial risk of distracting and confusing the jury" and would require numerous additional witnesses to explain, both of which are independent justifications for excluding evidence under section 352. (See § 352; *Villa, supra*, 55 Cal.App.5th at pp. 1052–1053.) Since Lopez does not claim the court erred by balancing these two concerns against the evidence's probative value, we need not consider the merits of his argument. (See *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237 [if "trial court states multiple grounds for its ruling and appellant addresses only some of them," argument is forfeited].) Even if we did, however, we would find no error given the evidence's minimal relevance.

## B. *The Trial Court Did Not Abuse Its Discretion in Imposing Some Consecutive Terms.*

Lopez claims the trial court improperly based its decision to run certain terms consecutively on the fact that after successfully appealing he decided to withdraw his plea and go to trial. We reject this claim.

### 1. Additional facts

As noted above, Lopez originally entered a plea and was sentenced to 35 years to life in prison. After we reversed the judgment, he withdrew his plea and chose to go to trial instead. Once the jury convicted him, the minimum sentence he faced was 75 years to life and the maximum term he faced was 204 years to life, based on whether certain terms were run consecutively or concurrently.

22

In her sentencing brief, the prosecutor asked the trial court to impose the maximum sentence. After arguing that several aggravating factors applied, the prosecutor wrote,

> "The defendant's actions have left scars on these two young women that will never be erased. Their entire lives are now shaped by . . . his selfish and perverse decisions and actions. Instead of taking responsibility for his actions, he demanded his trial. He demanded they come into court and relive what he put them through. He was given an opportunity to take a 40[-]year sentence to spare [L.] and [J.] from going through the hell that they experienced in having to come testify about the worst things that have happened to them in their lives.[8] He was given an opportunity to do the right thing so these girls didn't have to see his face again. He chose not to do that. . . . He now deserves to serve the maximum sentences for his actions."

At the sentencing hearing, the prosecutor again asserted that Lopez deserved the maximum sentence because he chose to go to trial. In particular, the prosecutor noted how difficult it was for L. to testify about what happened to her and stated, "[L.] was told, when Mr. Lopez entered his plea a number of years ago[,] that this matter was going to be over. She was told she would not have to come testify in this case. Mr. Lopez decided to appeal that conviction, which he won. He was given an opportunity to resolve for a much lower sentence than what he originally ple[]d to. He chose not to do that. He chose to bring these girls in here . . . to testify and to then take the stand himself and call them liars, say that what they testified to did not happen."

Lopez's trial counsel responded that she had never heard a prosecutor "come into court after a trial and argue that the [c]ourt should impose the maximum sentence because the [d]efendant exercised his [c]onstitutional

---

[8] On remand after our original decision, Lopez was offered a 40-year determinate sentence if he agreed to enter another plea.

23

right to make the People prove the charges against him beyond a reasonable doubt." She stated it was not Lopez's fault that "the People promised the victims in this case that they would not ever have to testify," and she argued that Lopez should not be punished for successfully appealing and choosing to proceed to trial instead of entering another plea. She also noted that he admitted to much of the charged conduct. When the trial court sought to confirm that California Rules of Court, rule 4.425(b) allowed it to consider "[a]ny circumstances in aggravation or mitigation," counsel responded, "Right. And whether the [d]efendant exercised his [c]onstitutional right to trial is certainly not one of them."

The prosecutor responded that Lopez never accepted responsibility for raping L., and "that whether or not he accepts early responsibility is something that the [c]ourt looks for and considers." She urged the trial court to therefore consider the fact that he rejected a second plea offer "to resolve this case to prevent these little girls from having to come in and testify."

The trial court imposed a sentence of 104 years to life in prison. Initially, the court observed that "these crimes are significant and they left an indelible significant impact on . . . [J.] and [L.] and [mother]. And I have to say that [J.] came into court and [L. came] into court incredibly bravely and talked about incredibly difficult things and reopened wounds that were hopefully not permanent, but extremely deep. . . . [¶] . . . And I'm incredibly sympathetic for these victims of these crimes."

Then, after noting the need to find aggravating circumstances to impose certain terms consecutively, the trial court imposed a consecutive term of 25 years to life for the sexual-penetration conviction because the crime was carried out in a manner indicating "planning, sophistication, and professionalism." The court also imposed a consecutive term of four years for

24

the conviction of contact with a minor because Lopez "took advantage of a position of trust" to commit the crime.  Otherwise, the court imposed concurrent sentences when it had the choice to do so.

2.     Analysis

When a defendant "is convicted of two or more crimes," the trial court must "direct whether the terms of imprisonment . . . shall run concurrently or consecutively."  (§ 669, subd. (a).)  In deciding whether to impose consecutive terms, the court may consider, with certain exceptions not relevant here, "[a]ny circumstances in aggravation or mitigation" even if they have not been stipulated to or found true beyond a reasonable doubt.  (Cal. Rules of Court, rule 4.425(b).)  Rule 4.421 contains a nonexclusive list of aggravating circumstances, including both on which the court explicitly relied:  that the crime involved "planning, sophistication, or professionalism" and that "[t]he defendant took advantage of a position of trust or confidence to commit the offense."  (*Id.*, rule 4.421, subd. (a)(8), (11).)

A trial court has "broad discretion" to decide whether to impose consecutive or concurrent terms.  (*People v. Clancey* (2013) 56 Cal.4th 562, 579.)  A court may not, however, " 'treat a defendant more leniently because [the defendant] foregoes [the] right to trial or more harshly because [the defendant] exercises that right.' "  (*Id.* at p. 575.)  We review the court's exercise of its sentencing discretion for an abuse of discretion and "presume [it] acted to achieve legitimate sentencing objectives."  (*People v. Shenouda* (2015) 240 Cal.App.4th 358, 368–369.)

Lopez does not contest that the trial court could properly rely on the two aggravating circumstances it identified to impose consecutive terms.  Instead, he claims the court's question to his trial counsel about whether California Rules of Court, rule 4.425 authorized it to consider "[a]ny

25

circumstances in aggravation or mitigation" and "its comments about the impact of the trial on [L.] and [J.] clearly demonstrate that the prosecutor's arguments formed part of its rationale for imposing consecutive terms." We agree with Lopez that the court could not consider his decision to go to trial as an aggravating circumstance, and the prosecutor improperly advocated to the contrary. But the record fails to demonstrate the court actually relied on his decision to go to trial in exercising its discretion.

First, the trial court's question about California Rules of Court, rule 4.425 is not suggestive, because the trial court posed it after Lopez's trial counsel argued that "very explicit rules of court . . . lay out what the [c]ourt should consider and can consider when making these decisions" and "the People didn't address any of those in their sentencing memo." Thus, the court was merely observing that it could consider factors other than those enumerated in rule 4.425, not suggesting it could consider Lopez's exercise of his right to trial specifically.

Second, the comments about L.'s and J.'s testimony likewise fail to demonstrate the trial court relied on Lopez's exercise of his right to trial as an aggravating circumstance. Lopez claims the court not only failed to "disavow the prosecutor's demand that [he] be punished for exercising his right to a jury trial" but "endorsed the prosecutor's comments." Although the court acknowledged the difficulty and pain L. and J. suffered by testifying, it did not thereby signal it agreed with the prosecutor's arguments. The acknowledgment came before the court explained its sentencing choices, and the court did not refer to the victims' experience of testifying in justifying the two discretionary consecutive terms. To the contrary, the court explicitly identified a proper aggravating circumstance to support each consecutive term. Moreover, the court imposed far less time consecutively than the

26

prosecutor urged it to do, further suggesting that it did not accept the prosecutor's arguments.  In short, the court did not abuse its discretion.

## III.
### DISPOSITION

The judgment is affirmed.  The trial court is directed to amend the abstract of judgment to reflect that the conviction of count five is under Penal Code section 288, subdivision (b)(1).  The court is also directed to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____

Humes, P.J.


WE CONCUR:



_____

Banke, J.



_____

Devine, J.*




      \*Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Lopez*  A163573