Benigno ROMERO–PEREZ, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

NO. 2014–CA–002006–MR

Court of Appeals of Kentucky.

RENDERED: JUNE 24, 2016; 10:00 A.M.

BRIEF FOR APPELLANT: Keith Woomer, Lexington, Kentucky

BRIEF FOR APPELLEE: Jack Conway, Attorney General of Kentucky, John Paul Varo, Assistant Attorney General, Frankfort, Kentucky

BEFORE: ACREE, CHIEF JUDGE; CLAYTON AND JONES, JUDGES.

## OPINION

JONES, JUDGE:

The Appellant, Benigno Romero–Perez, was sentenced to ten years of imprisonment by the Fayette Circuit Court after a jury found him guilty of first-degree burglary, fourth-degree assault (domestic violence), and fourth-degree assault (minor injury). On appeal, the Appellant asserts that he was denied his constitutional rights to cross-examination and to present a defense during his trial because the trial court refused to allow him to question one of the alleged victims, Gabriela Delarosa, about her pending U–Visa application.[1]

Upon careful review of the record and applicable authority, we hold that the trial court erred in disallowing questioning concerning the victim's U–Visa application. The success of the victim's application depended on a certification that she provided "helpful" assistance to the prosecution. The fact that the victim's U–Visa application was pending before the trial court was sufficient to support an inference that she might believe that it was in her best interests to testify in the Commonwealth's favor. Under the circumstances, however, we believe the trial court's error in this regard was harmless because other witnesses testified to substantially the same

---

1. A U–Visa enables victims of certain crimes, including domestic violence, to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity. *See* 8 U.S.C. §§ 1101(a)(15)(U)(iii)(2014), 1184(p)(6)(2015).

facts as the victim. Accordingly, we affirm.

## I. Background

The evidence at trial established that Romero–Perez had been in a relationship with, and lived with, Gabriela Delarosa for six years. Around January of 2013, the relationship ended and Delarosa moved to a new apartment by herself. Soon after moving into her own place, Delarosa began seeing Gabriel Valadez–Vasquez. On March 17, 2014, Delarosa and Valadez–Vasquez went on a date to a local restaurant where they ran into Romero–Perez. Valadez–Vasquez and Romero–Perez exchanged words at the restaurant, but nothing else occurred. After Delarosa and Valadez–Vasquez left the restaurant, they went to Delarosa's apartment and went to bed. Delarosa testified that shortly after she and Valadez–Vasquez went to bed, Romero–Perez entered through a bedroom window, grabbed her by her hair and began striking her face. Valadez–Vasquez came to her defense and was punched and bitten in the ensuing struggle. As the struggle continued, Delarosa grabbed the phone and called her brother, Miguel Lopez, for assistance. Lopez immediately responded from a neighboring apartment; however, when Lopez arrived, the door was locked. Lopez testified that after Valadez–Vasquez let him inside of the apartment, he proceeded to the bedroom where he observed Romero–Perez in the closet actively striking his sister. He grabbed Romero–Perez, took him into the living room, and held him down on the couch until police arrived.

When the officers arrived, Romero–Perez told them that he had been invited to Delarosa's apartment, and upon entering through the front door, Valadez–Vasquez attacked him. He informed the officers that Delarosa was injured when she was knocked down during her attempt to break up the fight between him and Valadez–Vasquez.

At trial, during the Commonwealth's case-in-chief, Romero–Perez sought to cross-examine Delarosa about the fact that she had applied for a U–Visa. He began by asking Delarosa whether she had received any benefit for testifying. Delarosa answered in the affirmative, but before she could elaborate, the Commonwealth objected, and the parties were called to the bench for a conference. During the bench conference, the trial judge informed the parties that she had received a U–Visa application from Delarosa, but had not signed it because the case was still pending, and she was concerned that if she signed the application before trial, Delarosa would not appear to testify. After a short back and forth between the parties, the court dismissed the jury so that it could entertain the parties' arguments outside of the jury's presence.

During subsequent discussions, the Commonwealth explained to the court that a U–Visa provides a noncitizen temporary relief from deportation if he or she has been a victim of, *inter alia*, domestic violence, if law enforcement authorities certify that the alien would be of assistance in an investigation or prosecution. In arguing for exclusion, the Commonwealth asserted that it would not be appropriate to offer a victim the protection of the U–Visa and then later subject that victim to cross-examination concerning the same. The Commonwealth further argued that such cross-examination would create a conflict of interest since defense counsel's law firm routinely assists clients in applying for U–Visas. The Commonwealth finally argued that such questioning would run the risk of turning a burglary and assault trial into an immigration case.

Romero–Perez insisted that he had the right to question the witness concerning

bias and motive to fabricate. He argued that, because the jury could infer that Delarosa may have fabricated the burglary and assault in order to obtain a U–Visa, or at least had an incentive to exaggerate her testimony at trial, he was entitled to that line of questioning.

The trial court was initially going to allow questioning concerning the U–Visa, but disallow any mention of Delarosa's immigration status. However, after further discussion, the court ultimately refused to allow questioning on both issues. The court cited concerns about the case turning into an immigration trial, concerns over a potential conflict of interest, and concerns that permitting cross-examination would "fly in the face" of the purpose of the visa. The court did, however, permit Romero–Perez to again ask Delarosa if she had been promised anything or received any benefit in exchange for her testimony. Upon being asked this question a second time, Delarosa answered in the negative, and Romero–Perez was forced to move forward without being permitted to question her any further about the U–Visa.

On appeal, Romero–Perez argues that the trial court abused its discretion by restricting his cross-examination of Delarosa regarding her potential bias and motivation to fabricate or embellish the charges. Specifically, he contends that the trial court improperly precluded him from asking Delarosa about her immigration status and whether she filed an application for a U–Visa following the alleged assault.

## II. STANDARD OF REVIEW

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (*citing Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky.1996)). Under this standard, a trial court's evidentiary ruling will not be disturbed unless its ruling was "arbitrary, unreasonable, un-fair, or unsupported by sound legal principals." *Id.*

The Sixth Amendment to the United States Constitution "guarantees the right of an accused in a criminal prosecution to be confronted with witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal quotations omitted). The primary interest secured by the Confrontation Clause is the right to cross-examine a witness. *Id.* Generally, a witness may be cross-examined on any facts which tend to show bias, interest, or motive which might affect the witness' credibility. *Keller v. Commonwealth*, 572 S.W.2d 157, 159 (Ky.1978). In order for the jury to properly weigh the testimony of the witness, it is entitled to hear all of the evidence calculated to influence the witness' testimony. *Id.* In general, credibility is always at issue. *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (1997).

Nevertheless, a trial judge may "impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant.'" *Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (*quoting Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)). "So long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Maddox*, 955 S.W.2d at 721. However, in a criminal case "where the defendant has the constitutional right to cross-examine witnesses against him," *Yates v. Commonwealth*, 430 S.W.3d 883, 901 (Ky.2014), "it should be remembered that the right implicated is [ ] fundamental

... and that such limitations should be cautiously applied." *Maddox*, 955 S.W.2d at 720.

■ In order to state a violation of the Confrontation Clause, a defendant must establish "facts from which jurors ... could appropriately draw inferences related to the reliability of the witness." *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436. The burden of establishing a violation is met when "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." *Id.*

### III. ANALYSIS

■ The issue before the trial court was whether evidence regarding whether Delarosa had applied for a U–Visa was relevant and admissible as impeachment evidence. Ultimately, the trial court disallowed the evidence. On review, we must determine whether the trial court's conclusion amounted to an abuse of discretion.

To place this issue in the proper context, it is necessary to briefly discuss the nature of the U–Visa program. Congress enacted the U–Visa program in 2000. A U–Visa enables victims of certain crimes, including domestic violence, to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity. *See* 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6). Once an individual has resided continuously in the United States for three years following the receipt of a U–Visa, she is eligible to apply for lawful permanent residency. *See* 8 U.S.C. § 1255(m) (2012). "An alien granted U–1 nonimmigrant status is employment authorized in-

cident to status." 8 C.F.R. § 214.14(f)(7)(2013).

In short, the U–Visa creates a pathway whereby an illegal immigrant may be able to obtain lawful permanent residency within three years. To obtain a U–Visa the applicant must: (1) "possess specific facts regarding the criminal activity leading a certifying official to determine that the petitioner has, is, or is likely to provide assistance to the investigation or prosecution of the qualifying criminal activity," 8 C.F.R. § 214.14(b)(3), and (2) [demonstrate that she is] "being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based, and since the initiation of cooperation, has not refused or failed to provide information and assistance reasonably requested." 8 C.F.R. § 214.14(b)(3).

One can readily see how the U–Visa program's requirement of "helpfulness" and "assistance" by the victim to the prosecution could create an incentive to victims hoping to have their U–Visa's granted. Even if the victim did not outright fabricate the allegations against the defendant, the structure of the program could cause a victim to embellish her testimony in the hopes of being as "helpful" as possible to the prosecution. *See* Michael Kagan, *Immigrant Victims, Immigrant Accusers*, 48 U. Mich. J.L. Reform 915, 945 (2015) ("The U visa ... gives witnesses a potentially powerful motive to make false or exaggerated reports.").

While some prejudice might result from allowing examination into the U–Visa application, we believe a criminal defendant's constitutional right to confront his accuser must prevail in this instance. Delarosa had applied for a U–Visa, which the trial court was waiting to certify until after trial. Certainly, it would have been entire-

ly reasonable for Delarosa to assume that the fate of her U–Visa rested on the testimony she gave at trial. Given the importance that obtaining legal status and the right to remain in the United States, perhaps indefinitely, carries with it, Delarosa certainly had a motive to provide "helpful" testimony to the prosecution. Additionally, as noted by other courts, the nature of the program can provide a motive for illegal immigrants to make unfounded or exaggerated allegations. *See, e.g., State v. Valle,* 255 Or.App. 805, 298 P.3d 1237, 1240 (2013); *State v. Perez–Aguilera,* 345 P.3d 295 (Kan.App.2015).

Here, it is clear that there was a "practical connection between the evidence sought to be introduced and the alleged implication of bias." *Holt v. Commonwealth,* 250 S.W.3d 647, 653 (Ky.2008). Delarosa successfully obtaining a U–Visa was dependent on her being a victim of domestic violence. Thus, we conclude that the evidence of Delarosa's application for a U–Visa was relevant evidence from which the jury could infer that Delarosa had a personal interest in the outcome of the case.

It is true that a witness' immigration status could trigger negative sentiments in the minds of some jurors. In this case, any prejudice that might result from the jury knowing the victim's immigration status must be weighed against Romero–Perez's right to effective cross-examination. Being a victim of a crime and providing helpful assistance to the Commonwealth in prosecuting the alleged perpetrator of that crime would allow the victim in this case to obtain a visa permitting her to remain in the United States. Additionally, after three years, the victim could seek permanent resident status. The value of such status for those living in immigration limbo cannot be overstated. The ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resi-

dent in a relatively short amount of time without ever having to the leave the United States, *could* provide a strong motive for fabrication or embellishment.

Given the nature of the U–Visa program, we must conclude that a criminal defendant's right to effectively probe into a matter directly bearing on witness credibility and bias must trump any prejudice that would result from the jury's knowledge of the victim's immigration status. The probative value of disclosing the immigration status and knowledge of the U–Visa program outweighs any prejudice to the witness stemming from such disclosure. Therefore, we conclude that the trial court erred in excluding evidence of Delarosa's pending U–Visa application.

 Nevertheless, the "improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to … harmless-error analysis." *Star v. Commonwealth,* 313 S.W.3d 30, 38 (Ky.2010) (*quoting Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1431). "The test for harmless error is whether there is any reasonable possibility that, absent the error, the verdict would have been different." *Taylor v. Commonwealth,* 995 S.W.2d 355, 361 (Ky. 1999). Whether the error is harmless beyond a reasonable doubt depends on a number of factors, including: the importance of the witness' testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; the extent of cross-examination otherwise permitted; and, the overall strength of the prosecution's case. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

 Here, Delarosa's version of the events was corroborated by testimony from two other witnesses, Valadez–Vasquez, and Lopez, from the point he arrived

on the scene. Her version of the events was also corroborated by the physical evidence including: fresh footprints leading up to an open window to Delarosa's bedroom; bloodstains in the closet where Delarosa's head had been; and lacerations and injuries on both Delarosa and Valadez–Vasquez that were consistent with what each said occurred. Accordingly, we hold that while it was error for the trial court to limit Romero–Perez's cross-examination, given the overwhelming evidence of guilt in the record, the error was harmless beyond a reasonable doubt.

Based on the foregoing, Romero–Perez's conviction and sentence is affirmed.

ALL CONCUR.