

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00090-CR

_____

CARLOS CHAVEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F22-717-462

Dissenting Memorandum Opinion by Justice Walker

## DISSENTING MEMORANDUM OPINION

I respectfully dissent.  In my view, the trial court erred by precluding Chavez from cross-examining Mother[1] about her U-Visa status, and this error was not harmless.  Accordingly, I would reverse the trial court's judgment and remand for further proceedings.[2]

## I.  CONSTITUTIONAL RIGHT TO CROSS-EXAMINATION

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI. This fundamental right secures for the accused "more than being allowed to confront the witness physically."  *Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110 (1974).  Indeed, "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination' . . . because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'"  *Johnson v. State* (*Thaxton D. Johnson*), 433 S.W.3d 546, 551 (Tex. Crim. App. 2014) (quoting *Davis*, 415 U.S. at 315–16, 94 S. Ct. at 1110).  In exercising this right, "a defendant is allowed great latitude to show any fact which would tend to establish

---

[1]Because the majority opinion refers to the complainants as Shelly and Tonya and their mother as Mother, I do the same.

[2]While I agree with the majority's resolution of Chavez's second issue, I would hold that it need not be resolved due to the trial court's reversible error as to his first issue.  *See* Tex. R. App. P. 47.1.

ill feeling, bias, motive[,] and animus on the part of the witness testifying against him." *Hurd v. State*, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987). Essentially, the Confrontation Clause ensures a holistic cross-examination of State's witnesses on relevant matters, as opposed to limited piecemeal cross-examinations.

The majority focuses primarily on an evidentiary analysis rather than the more essential Constitutional concerns raised by Chavez. Thus, the foundation of my complaint with the majority opinion is that it starts at the wrong place—by granting the trial court undue discretion. It is true that we normally apply an abuse of discretion standard to a trial court's evidentiary rulings, giving it "wide latitude" to set boundaries related to the cross-examination of witnesses. *Arnold v. State*, No. 02-18-00022-CR, 2019 WL 165995, at *4 (Tex. App.—Fort Worth Jan. 10, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Thaxton D. Johnson*, 433 S.W.3d at 555). But, in the context of a Sixth Amendment confrontation objection, a trial court's discretion "simply does not come into play" until "it can be determined" through de novo review "that the cross[-]examination satisfied the Sixth Amendment." *Thaxton D. Johnson*, 433 S.W.3d at 551 (internal quotations and punctuation omitted); *see Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006) ("Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling . . . *de novo*."); *Jordan v. State*, No. 02-19-00148-CR, 2020 WL 5666559, at *2 (Tex. App.—Fort Worth Sept. 24, 2020, no pet.) (mem. op., not designated for publication) ("We review the exclusion of defensive evidence

3

for an abuse of discretion, but review any unsuccessful confrontation objections de novo."); *see also Wilson v. State*, 151 S.W.3d 694, 697 (Tex. App.—Fort Worth 2004, pet. ref'd) ("Therefore, the first issue we must address is not whether [appellant's] statements should have been admitted under the rules of evidence but whether the admission violated Appellant's Sixth Amendment right to confrontation. In deciding this constitutional issue, we review the trial court's ruling de novo.").

Thus, in the face of a confrontation objection, rather than jumping straight to whether Mother's U-Visa testimony was relevant—a purely evidentiary determination—we must first determine whether the whole-hog exclusion of that testimony violated Chavez's Sixth Amendment right to cross-examination. *See Wilson*, 151 S.W.3d at 697. I believe that it did.

While a trial court has the latitude to "impose reasonable limits" on cross-examination, it exceeds this latitude when it "exercises its discretion to so drastically curtail the defendant's cross-examination as to leave him unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Thaxton D. Johnson*, 433 S.W.3d at 555 (internal quotations omitted). This kind of error is most obvious "when the trial court *entirely* forecloses the defense from exposing—'prohibit[s] *all* inquiry into'—a 'prototypical form of bias.'" *Id.* at 556 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 1436 (1986)); *see Austin v. State*, No. 02-18-00484-CR, 2019 WL 6205247, at *9 (Tex. App.—Fort Worth Nov. 21, 2019, pet.

4

ref'd) (mem. op., not designated for publication) ("The test to determine the scope of cross-examination demanded by the Confrontation Clause is whether the defendant could present a vital defense theory without the evidence, not whether the defensive theory is as strong as it could be with the evidence."). Put differently, a trial court violates the Confrontation Clause when it "cut[s] off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435.

Within this framework, the testimony sought by the defense must still have some "causal" or "logical" connection to the bias or motive alleged. *Thaxton D. Johnson*, 433 S.W.3d at 552–53. In *Thaxton D. Johnson*,[3] the Texas Court of Criminal Appeals explained the causal or logical connection requirement this way:

> Given that our "causal connection' requirement is ultimately rooted in the concept of relevance, however, it must also be borne in mind that the failure to affirmatively establish the fact sought does not prevent the

[3]*Thaxton D. Johnson* involved two State's witnesses who faced pending felony charges. 433 S.W.3d at 548. At trial, the appellant had sought to show that these witnesses were prone to offer biased testimony in favor of the State by cross-examining them about their pending felony charges. *Id.* The trial court limited this cross-examination "to exposing the fact that the witnesses stood accused only of certain unspecified felonies." *Id.* (internal punctuation omitted). The appellant argued that the trial court violated his confrontation rights by not allowing a more granular look into the "nature, degree, and punishment ranges" of each witnesses' specific charges. *Id.* at 550. Despite holding that the punishment ranges of the witnesses' charges met the causal connection requirement showing potential bias, the Court of Criminal Appeals affirmed, holding that the trial court had set a reasonable limit on cross-examination because even a general discussion of the witnesses' felony charges served to sufficiently present their alleged biases to the jury. *Id.* at 557.

cross-examination from having probative value in regard to the witness'[s] credibility. This sensibility is aptly expressed in an oft-repeated legal aphorism: "A brick is not a wall." To be considered "relevant," the proffered evidence need not definitively prove the bias alleged—it need only "make the existence" of bias "more probable or less probable than it would be without the evidence." The question in this case is whether the Confrontation Clause guarantees that the accused be permitted to use every brick at his disposal—no matter how incrementally it may serve to reinforce the wall.

*Id.* at 552 (footnotes omitted) (quoting Tex. R. Evid. 401).

I believe that the trial court committed constitutional error here because—by prohibiting all evidence related to Mother's U-Visa application—it entirely foreclosed Chavez from presenting any facts to the jury related to a vital defensive theory. In fact, one might say that the trial court foreclosed Chavez from presenting his only viable defense in this typical sexual assault case where the believability of the complainants formed the foundation of the State's case. As a result, Chavez was prevented from exposing jurors to significant prototypical motive or impeachment evidence showing that Mother stood to gain a benefit from the State in return for her cooperation in Chavez's prosecution. *See id.* at 556.

## II. U-VISAS OFFER SUBSTANTIAL BENEFITS AND PROVIDE POWERFUL IMPEACHMENT EVIDENCE

As the majority explained, U-Visas provide an opportunity for victims of sexual abuse and their qualifying family members—such as Mother—who are not legally in the United States to obtain nonimmigrant status. 8 U.S.C. §§ 1101(a)(15)(U)(ii), (iii), 1184(p). This legal status is offered to the victims and their qualifying family

6

members who "have been helpful, [are] being helpful, or [are] likely to be helpful" to law enforcement in the prosecution of those crimes. *Id.* § 1101(a)(15)(U)(i). To apply for a U-Visa, the applicant must obtain a certification from law enforcement confirming such helpful cooperation; and eligibility can be lost, or an already approved U-Visa can be revoked, if the person fails "to provide information and assistance reasonably requested." 8 C.F.R. §§ 214.14(a)(12), (b)(3), (h)(2)(i)(A). U-Visas generally entitle their holders to four years of nonimmigrant status—which can be extended—and holders may be eligible for legal permanent residence (i.e., a "green card") after three years. 8 U.S.C. §§ 1184(p)(6), 1255(m)(1)(A); *see Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 545 (5th Cir. 2016). U-Visa applicants with pending applications may also be eligible to obtain work authorization. 8 U.S.C. § 1184(p)(6).

In light of these benefits, a number of courts have held that U-Visa evidence is the type of prototypical impeachment evidence that can show a witness's motive or bias and is, thus, appropriate for cross-examination.

In *Cazorla*, employees sued their employer for sexual harassment and abuse, and the employer claimed that the employees fabricated the allegations to obtain U-Visa benefits. *Cazorla*, 838 F.3d at 544. The employer sought discovery related to the employees' U-Visa applications; the employees argued that it was irrelevant and prejudicial. *Id.* The trial court partially allowed the discovery. *Id.* The Fifth Circuit Court of Appeals concluded that the trial court did not err in allowing the discovery, explaining that it was

7

plausible that some undocumented immigrants might be tempted to stretch the truth in order to obtain lawful status—and perhaps even lawful *permanent* status—for themselves and their families. U[-V]isa applicants are analogous to testifying informants in criminal trials, and in that context, as one court has pithily observed, "[a]ny competent lawyer would . . . know[] that . . . special immigration treatment by [law enforcement agencies] [is] highly relevant impeachment material."

*Id.* at 559 (footnotes omitted) (quoting *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004)).

In *State v. Juan A. G.-P.*—a recent case out of Connecticut—the defendant was charged with sexually assaulting multiple children. 287 A.3d 1060, 1068 (Conn. 2023). The children's mothers testified at trial and the defendant sought to cross-examine them both about their U-Visa applications to show that they may have been motivated to offer testimony beneficial to the State due to those applications. *Id.* at 1077. Outside the presence of the jury, both mothers testified that they (1) did not learn about the existence of U-Visas until after their children's sexual abuse had been reported and (2) did not complete their U-Visa applications until years after the abuse had been reported. *Id.* at 1078–79. And, though not entirely clear, it appears that at least one of the mothers' applications was still pending at the time of trial. *Id.* at 1079. The trial court prohibited the defendant from cross-examining either mother about their immigrant status or U-Visa applications. *Id.* It reasoned that such evidence was irrelevant and that "no nexus" existed between the mothers' U-Visa applications and any "possible interest [in] the outcome of the case" because neither mother knew of

8

the existence of U-Visas until after the outcries of abuse had been made. *Id.* Thus, said the trial court, they had no incentive to fabricate their testimony. *Id.*

Relying in part on the Fifth Circuit's "apt" comparison in *Carzola* of U-Visas to cooperation agreements, the Connecticut Supreme Court held that the trial court had violated the defendant's confrontation rights. *Id.* at 1081. It first pointed out that, by concluding that the defendant had failed to establish a nexus between the mothers' U-Visa applications and any possible motive, the trial court had made impermissible findings concerning the mothers' credibility—a determination that should have been left to the jury. *Id.* at 1081–82. It then explained that the mothers' testimonies about when they learned about U-Visas did not render that evidence irrelevant:

> It is well established that jurors are free to believe some, all, or none of a witness'[s] testimony. Even if the jury believed [the mothers'] testimon[ies], it would not render the U[-V]isa evidence irrelevant. "One can readily see how the [U-Visa] program's requirement of 'helpfulness' and 'assistance' by the [witness] to the prosecution could create an incentive to [witnesses] hoping to have their [U-Visas] granted. Even if the [witness] did not outright fabricate the allegations against the defendant, the structure of the program could cause a [witness] to embellish [his or her] testimony in the hopes of being as 'helpful' as possible to the prosecution."

*Id.* at 1082 (internal citations omitted) (quoting *Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906 (Ky. Ct. App. 2016)).

In *Romero-Perez*, a domestic-assault victim had applied for a U-Visa, and the defendant sought to use that evidence to show her motive or bias. 492 S.W.3d at 904. The trial court—citing fears about turning the case "into an immigration trial"—

excluded the evidence but allowed the witness to be asked whether she had been promised anything or received a benefit in exchange for her testimony, which she answered in the negative. *Id.* at 905. The Kentucky Court of Appeals held that the trial court erred in excluding the U-Visa evidence, stating that "[t]he ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to leave the United States, *could* provide a strong motive for fabrication or embellishment." *Id.* at 907.[4]

I agree with the reasoning in these cases. Though Mother's testimony may not have definitively proved that she was motivated to offer embellished or biased

---

[4]Still more courts agree with the reasoning that a trial court errs by prohibiting all mention of U-Visa evidence for impeachment purposes. *See, e.g.*, *People v. Anguiano*, No. B304946, 2021 WL 3732619, at \*10 (Cal. Ct. App. Aug. 24, 2021) (not designated for publication) ("To the extent that [the witness] was made aware that her cooperation in the investigation or prosecution of certain enumerated offenses could provide an avenue towards permanent residence and citizenship [via a U-Visa], such knowledge would have provided a strong ulterior motive to fabricate or exaggerate any criminal charges leveled against [the defendant]."); *State v. Zapata-Grimaldo*, No. 117,831, 2018 WL 6071478, at \*5 (Kan. Ct. App. Nov. 21, 2018) (mem. op., not designated for publication) ("[Although the victim] applied for a U-Visa well after reporting [the defendant] to law enforcement . . . a jury could conclude [that she] believed [that] she needed to testify against [him] to be helpful to the certifying agency in its investigation or prosecution against him."); *State v. Del Real-Galvez*, 346 P.3d 1289, 1294 (Or. Ct. App. 2015) ("Because [the victim's] mother had applied for an opportunity to stay in the United States on the ground that her daughter had been sexually abused and coerced, a jury could reasonably infer that [the victim], out of a desire to help her mother obtain a U[-][V]isa, had a personal interest in testifying against the defendant."); *State v. Dickerson*, 973 N.W.2d 249, 261 (S.D. 2022) ("[A]lthough [the witness] had not yet applied for a U-Visa, a jury could infer from his knowledge of the program and his indication that 'if it comes to that point' he would 'of course' apply for one, that he had an incentive to embellish or exaggerate his testimony against [the defendants] in order to be perceived as the victim in the events in question.").

testimony for U-Visa purposes, it undoubtedly would have made the existence of that motive "more probable" than it would have been otherwise. *See Thaxton D. Johnson*, 433 S.W.3d at 552. There is no dispute that Mother (1) did not have full legal status to remain in the United States, (2) knew about the existence of U-Visas before the allegations were made against Chavez, (3) knew that a U-Visa "could get [her] some sort of legal status" to remain in the United States, and (4) actually applied for a U-Visa after the outcries were made because she "want[ed] to stay here and stay with [her] daughters." The majority—persuaded only by Mother's testimony about her knowledge of U-Visas and the timing of her application for a U-Visa in relation to the outcries—concludes "that the evidence of Mother's U-Visa application cannot meet the 'causal connection' requirement." But the problem with this conclusion is that it rests entirely on a factual finding that Mother's testimony was credible—a determination that should have been put to the jury. *See Davis*, 415 U.S. at 317, 94 S. Ct. at 1111 ("We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted [the] line of reasoning [related to the witness's prior placement on juvenile probation] had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony . . . ."). For these reasons, I would hold that evidence of Mother's U-Visa application was proper for cross-examination and

11

that the trial court violated Chavez's confrontation rights by wholly prohibiting him from presenting such evidence to the jury.

### III. ERROR WAS NOT HARMLESS

The inquiry does not end there, though, as we must also determine whether the trial court's error was harmful. *See Haggard v. State*, 612 S.W.3d 318, 328 (Tex. Crim. App. 2020). I would hold that it was.

The denial of a defendant's confrontation right is reviewed for harmless error. *Id.* The State bears the burden to prove beyond a reasonable doubt that the error did not contribute to the conviction. *Id.* When conducting a harmless-error review of the improper denial of a defendant's right to impeach a witness for bias, "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438. In doing so, we consider the following factors: the importance of the witness's testimony to the prosecution's case, whether the testimony is cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on the material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.* at 684, 106 S. Ct. at 1438.

The State argues that any error here was harmless beyond a reasonable doubt because (1) Mother's testimony was "important but not essential" as it was "largely cumulative," (2) Mother's testimony was corroborated by her daughters' testimonies,

12

(3) Chavez was permitted to extensively cross-examine Mother, which included asking her about other possible motives that she might have had to lie (e.g., jealousy of other women that Chavez spent time with or lack of financial support from Chavez), and (4) the State's case was strong.

As the State concedes, Mother's testimony was important, though somewhat cumulative. It is also not disputed that Chavez was otherwise able to freely cross-examine her. However, because there was no physical evidence here, the relative strength of the State's case hinged solely on the credibility of its witnesses—particularly that of Shelly, Tonya, and Mother. This is a fact that the State used as a battering ram in securing a conviction of Chavez. At closing, the State spent considerable time arguing to the jury that Shelly and Tonya had no motive to fabricate the allegations against Chavez, that they were credible witnesses, and that their testimonies alone were sufficient to support a guilty verdict:

- "[Shelly] and [Tonya]'s testimony alone is enough to convict [Chavez]."

- "I want to talk to you briefly about witness credibility. . . . I want you to think about what these two girls had to gain by lying, and I want you to think about everything that they lost."

- "I'm asking you - - I'm telling you to believe these girls because they're telling the truth . . . ."

- "It is absolutely ridiculous to think that [Mother] concocted a story for her daughters to outcry years ago that [Chavez] was having sexual relations with them because she was jealous that he had another relationship."

- "Let's talk about what you didn't hear.  Not one witness came in here and said that the girls had a character for untruthfulness.  Not a single human said that they don't tell the truth. . . .  Not a single person came in here and said that [Mother] has a character for untruthfulness.  Because they have a character for truthfulness."

- "It makes no sense for the girls to make up a story about [Chavez].  There's no evidence that these were false allegations, that the girls benefited in any way . . . ."

- "Why would you make up a story that doesn't benefit you?"

- "[Chavez] gave no reason on why the girls would make this up.  Because there is no reason."

- "I'm asking you to believe those girls.  Please believe those girls.  They have no reason to lie."

But the fact of the matter is that Shelly, Tonya, and Mother did have a powerful reason to fabricate or embellish their testimony for the State: to aid Mother in obtaining a U-Visa which could lead to her permanent, legal residence in the country.  The jury, though, heard no evidence relevant to this inquiry.  The trial court's error deprived Chavez of the opportunity to meet the State's arguments and deprived the jury of considering all of the information relevant to weighing the credibility of Mother and her daughters.  In light of this, I cannot conclude beyond a reasonable doubt that the trial court's error was harmless and did not contribute to Chavez's conviction.  I think it is reasonable to infer that, had the jury been privy to the U-Visa evidence, they may have drawn different conclusions about the credibility

14

of Mother's and her daughters' testimonies. And this could have affected the outcome of the trial.

For these reasons, I respectfully dissent.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 9, 2023