IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40126-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GILBERTO IBARRA-ALDACO | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Gilberto Ibarra-Aldaco appeals his convictions for assault and harassment committed against his wife. He claims the trial court erred when precluding him from presenting evidence that his wife sought U-visa status. We reject the assignment of error and affirm the convictions.

FACTS

The prosecution of Gilberto Ibarra-Aldaco stems from an altercation with his wife, Belen Arellano-Barosio, during the early morning of July 17, 2023. In July 2023, Ibarra-Aldaco and Arellano-Barosio had been married for twelve years and shared three

daughters, ages 7, 9, and 10 years old. On July 16, 2023, Arellano-Barosio caught her husband viewing pornography and expelled him from the family's apartment.

Gilberto Ibarra-Aldaco drank intoxicants the night of July 16. He returned to the apartment around 3:00 or 4:00 in the morning on July 17. Ibarra-Aldaco lacked a key to the apartment. Ibarra-Aldaco knocked loudly on the front door, and entered through a window after Belen Arellano-Barosio did not open a door. When questioned during trial about his return to a residence where he was unwelcome, Ibarra-Aldaco responded: "She always runs me off and then later I always come back." Report of Proceedings (RP) at 382.

Gilberto Ibarra-Aldaco approached his wife in the bedroom. Belen Arellano-Barosio and Ibarra-Aldaco dispute what actions occurred then.

According to Gilberto Ibarra-Aldaco, he walked toward the bed, knelt next to Belen Arellano-Barosio who lay on the bed, and grabbed her wrists. He noticed some dark patches on her face and believed the patches might be dried blood. Ibarra-Aldaco asked Arellano-Barosio what happened. Arellano-Barosio did not respond. Ibarra-Aldaco got off the bed and walked to a nearby lamp, at which time Arellano-Barosio ran from the house. Ibarra-Aldaco denies striking or biting Arellano-Barosio causing any injuries. He further denied threatening her.

According to Belen Arellano-Barosio, Gilberto Ibarra-Aldaco entered the bedroom while uttering "nasty things." RP at 266. He told her to scream because nobody would

2

hear her. Ibarra-Aldaco then struck Arellano-Barosio in the face with his fists. He next bit Arellano-Barosio on the cheek while straddling her. Later, he put his hands around her throat to the point she could not breathe. Ibarra-Aldaco angrily retorted: "Tell me already that you're cheating. Just tell me." RP at 269. Ibarra-Aldaco added that someone would die. Arellano-Barosio testified that Ibarra-Aldaco struck her between ten and twenty times. Arellano-Barosio never saw a knife. Ms. Barosio stated that Mr. Ibarra-Aldaco told her she was going to die, or that someone was going to die: "He said I was going to die. I was going to die either or he or I was. Someone was going to die." RP at 288.

The altercation ended when Belen Arellano-Barosio fled to a neighbor's apartment to call 911. She reported that her husband strangled her, threatened to kill her, and he had a knife. After Arellano-Barosio left the home, Gilberto Ibarra-Aldaco slept in the living room, while the three daughters remained in their shared bedroom.

Officers Jorge Quinones and Casey Kim from the Yakima Police Department responded to the 911 call and found Gilberto Ibarra-Aldaco lying on the living room floor. They arrested him without incident. When interviewing Belen Arellano-Barosio, Officer Quinones observed scratches on her chest and neck, swelling and bruises starting to form on her face, and what appeared to be teeth marks on her left cheek. Arellano-Barosio reported Ibarra-Aldaco had arrived highly intoxicated and began yelling and banging on the door until he was let inside. He then accused her of cheating on him and

3

pummeled her face, strangled her neck, and threatened to kill her. After taking Arellano-Barosio's statement and photographing her injuries, Officers Quinones and Kim transported her to the hospital.

Belen Arellano-Barosio testified at trial that Gilberto Ibarra-Aldaco entered the house and her bedroom despite both doors being locked. Law enforcement found no damage to either door. During trial testimony, Arellano-Barosio stated that Ibarra-Adalco's knowledge of construction explained the lack of damage to the door.

On July 19, 2023, Detective Ileanna Salinas continued the investigation by taking additional photographs of Belen Arellano-Barosio's injuries. Detective Salinas deemed Arellano-Barosio's neck injuries consistent with bruising he had witnessed in other intimate partner violence cases.

Following her husband's arrest, Arellano-Barosio sought permanent legal status for her and her children as crime victims under federal immigration law. The federal government calls this process for gaining permanent status as a U-visa.

Belen Arellano-Barosio testified that she believed Gilberto Ibarra-Aldaco to be armed with a knife. But she never saw a knife. Law enforcement recovered no knife. Arellano-Barosio filed for divorce on August 21, 2023.

PROCEDURE

The State of Washington charged Gilberto Ibarra-Aldaco with two counts of second degree assault with a domestic violence appendage and one count of felony

harassment with a domestic violence appendage. During discovery, the State disclosed to

Ibarra-Aldaco, a September 6, 2023 letter from Rodman Immigration Law whereby

Belen Arellano-Barosio petitioned for a U-visa status.

During motions in limine, the State sought to preclude Gilberto Ibarra-Aldaco

from cross-examining Belen Arellano-Barosio, under ER 413(a)(4), regarding her

application for a U-visa. During the hearing, defense counsel argued that the application

for the U-visa showed bias of Belen Arellano-Barosio because she made accusations

against Ibarra-Aldaco to remain in the United States. The State answered that the

application lacked relevance because Belen Arellano-Barosio did not apply for the

immigration status until after reporting the assault.

During the motion in limine hearing, the trial court asked defense counsel:

> COURT: Do you know whether she [Belen Arellano-Barosio] thinks that there must be a conviction in order to perfect her application for permanent legal status, resident status?
> DEFENSE: No. I don't know that. But also, seeing through this case I think its part of her—part of the U-visa is to act as a—cooperate in the prosecution of an alleged victim.
> COURT: Did you know or have you been able to find out through discovery that she was aware prior to the accusation that she could be eligible for a U-visa by making such an accusation?
> DEFENSE: No, Your Honor. I don't have information to that effect. I do have information that she has made application for a U-visa, which I believe is for persons alleged to be victims of criminal offenses.
> COURT: But you don't know when she—you haven't been able to verify when she made application?
> DEFENSE: No. I haven't been able to verify that. I do have something in discovery on the prosecutor's letterhead dated September 6th. Our office has received your request for review and signature of your

client's U-visa application. Enclosed you will find the signed copy of your client's petition. This is signed by Esmerelda Noel, office specialist in the employ of the prosecutor's office. And it is written to Rodman Immigration Law, 803 East D Street in Yakima. And it does specifically reference this case.

COURT: (addressing the State) Mr. Haueter [prosecuting attorney], do you wish to expand on your motion?

STATE: Well, Your Honor, Ms. Barosio, it is in discovery that she made an application for a U-visa. Her status as a U-visa applicant is irrelevant to show motive at the time that the allegations were made. It's my understanding that that application occurred well after this incident. And that that should be excluded under 413(a)(4).

COURT: Do we have a—do we know what this witness's answer will be to such a question about whether or not she knew about the use or application of a U-visa by making an allegation does? Does she have any knowledge of that? Or are we going on a fishing expedition in the middle of trial? That's my question. I think we need some sort of offer of proof as to her knowledge about the U-visa application or an allegation affecting her ability to stay within the U.S. If we don't know anything about that, then I don't know that we can go down that road in the middle of trial. So has there been questions about that to the complaining witness or that we would have knowledge of her answers?

DEFENSE: No, Your Honor. I haven't made such inquiry.

COURT: So for now I'm granting the state's motion with the caveat that if you—if the defense becomes aware that she would have otherwise had knowledge that such a complaint or allegation would effect [sic] ability to stay as a resident in the U.S., then I would reconsider. Since I don't have anything to back up, I don't have information from, for instance, an interview. So I'm not able to making a finding that that is something that was relevant…. We don't have any offer of proof and any statements to that effect. If something comes up, … or you read through discovery that's already there and you want to revisit this, please bring it to my attention and I'll, you know, entertain a motion for reconsideration.

RP at 55-56. Defense counsel never moved the court to reconsider its decision.

When questioned about the kinds of injuries typically observed in intimate partner

violence cases, Officer Jorge Quinones testified that the visible scratches and bruising

were normal, that handprint bruising from manual strangulation was not typical in "most cases," and that it may take longer for bruising to appear on the skin of some victims than others. RP at 310. His testimony was corroborated by photographs entered into evidence at trial. Detective Ileanna Salinas testified that she observed bruises and scratch marks on Belen Arellano-Barosio's face and arms, including a notable bruise and swelling on her left cheek.

The jury found Gilberto Ibarra-Aldaco guilty of counts 2 and 3 as charged, and guilty of the lesser crime of assault in the fourth degree—domestic violence under count 1.

LAW AND ANALYSIS

Gilberto Ibarra-Aldaco exclusively argues on appeal that his trial counsel performed ineffectively when failing to execute the needed steps, under ER 413, to impeach Belen Arellano-Barosio with evidence that she applied for U-visa status. We lack evidence that Arellano-Barosio knew, when she reported the assault by Ibarra-Aldaco to law enforcement, about the opportunity to gain permanent legal status in the United States by applying for a U-visa. Thus, Ibarra-Aldaco cannot meet his requirement to show prejudice under the ineffective assistance of counsel two-part test.

We first discuss the United States government's U-visa program. We next review the breadth of and strictures in ER 413. Finally, we outline the law of ineffective assistance of counsel and apply Gilberto Ibarra-Aldaco's contention to that law.

7

U-visa

Gilberto Ibarra-Aldaco complains on appeal of his inability to impeach Belen Arellano-Barosio because of her application for U-visa status in the United States. According to Ibarra-Aldaco, Arellano-Barosio falsely accused him of the assault so that she could apply for this status.

Congress enacted the U–visa program in 2000. A U–visa enables victims of certain crimes, including domestic violence, to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity. 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6). Once an individual has resided continuously in the United States for three years following the receipt of a U–visa, she is eligible to apply for lawful permanent residency. 8 U.S.C. § 1255(m) (2012). In short, the U–visa creates a pathway whereby an illegal immigrant may obtain lawful permanent residency within three years. To obtain a U–visa, the applicant must: (1) possess specific facts regarding the criminal activity leading a certifying official to determine that the petitioner has, is, or is likely to provide assistance to the investigation or prosecution of the qualifying criminal activity, and (2) demonstrate that she is "being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based, and since the initiation of cooperation, has not refused or

failed to provide information and assistance reasonably requested." 8 C.F.R. §

214.14(b)(3).

The U-visa program's requirement of victim "helpfulness" and "assistance" to the

prosecution creates an incentive to victims hoping to obtain a U-visa. Even if the victim

does not outright fabricate the allegations against the accused, the structure of the

program could cause a victim to embellish her testimony in the hopes of being as

"helpful" as possible to the prosecution. *Romero-Perez v. Commonwealth*, 492 S.W.3d

902, 906 (Ky. Ct. App. 2016); Michael Kagan, *Immigrant Victims, Immigrant Accusers,*

48 U. Mich. J.L. Reform 915, 945 (2015).

In *Romero-Perez v. Commonwealth*, 492 S.W.3d 902 (Ky. Ct. App. 2016), the

court reversed the accused's conviction because the trial court sustained an objection to

the introduction of evidence that the alleged victim applied for U-visa status. The trial

court waited to certify the application until after completion of the trial. *State v. Streepy,*

199 Wn. App. 487, 400 P.3d 339 (2017) resulted in the opposite outcome. The accused

failed to show that the witness knew about the program when she reported the assault.

ER 413

ER 413 declares in relevant part:

> IMMIGRATION STATUS
> (a) Criminal Cases; Evidence Generally Inadmissible. In any
> criminal matter, evidence of a party's or a witness's immigration status
> shall not be admissible unless immigration status is an essential fact to
> prove an element of, or a defense to, the criminal offense with which the

defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607. The following procedure shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness:

(1) A written pretrial motion shall be made that includes an offer of proof of the relevancy of the proposed evidence.

(2) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.

(3) If the court finds that the offer of proof is sufficient, the court shall order a hearing outside the presence of the jury.

(4) The court may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.

(5) Nothing in this section shall be construed to exclude evidence if the exclusion of that evidence would violate a defendant's constitutional rights.

Gilberto Ibarra-Aldaco focuses on his trial counsel's failure to file a ER 413 pretrial motion to admit evidence of Belen Arellano-Barosio's application for U-visa status. Oddly, the State's motion in limine precluding introduction of Arellano-Barosio's application for U-visa status raised the potential for introduction of the evidence. The State never sought to exclude the evidence because of the failure of defense counsel to file a motion under ER 413, but because the evidence lacked any relevance. The trial court inquired of defense counsel whether he possessed any evidence that Arellano-Barosio knew she could apply for U-visa status at the time she reported the assault. The trial court reasoned that the evidence lacked relevance unless Arellano-Barosio knew of the process when she complained about Ibarra-Aldaco's violent conduct. Defense counsel conceded he lacked evidence that Belen Arellano-Barosio knew of the U-visa

10

process on July 17, 2023 when she called law enforcement. The trial court granted the State's motion in limine not because of defense counsel's failure to file an ER 413 motion, but because of the lack of evidence of Arellano-Barosio's knowledge of the process at the time of the alleged assault.

Ineffective Assistance of Counsel

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must prove the following two-pronged test: (1) defense counsel's representation was deficient, *i.e.,* it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.,* there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). A defendant must satisfy both prongs of the ineffective assistance of counsel test. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996), *overruled on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). In this appeal, we only address the prejudice prong of the test.

Trial counsel's filing of an ER 413 motion would have benefitted Gilberto Ibarra-Aldaco only if the superior court would have granted the motion to impeach Belen

Arellano-Barosio with evidence of applying for U-visa status. The record shows otherwise. The trial court would have denied the motion because of the lack of evidence that Arellano-Barosio knew of the possibility of gaining the immigration status by reporting Ibarra-Aldaco's conduct and cooperating with law enforcement. Ibarra-Aldaco does not fault his counsel for any failure of investigation into the timing of Arellano-Barosio's knowledge of the U-visa process or his performance during the State's pretrial motions in limine hearing. Thus, he shows no prejudice.

Statement of Additional Grounds

In a statement of additional grounds, Gilberto Ibarra-Aldaco challenges the sufficiency of evidence on the theory that Belen Arellano-Barosio exaggerated her testimony. Nevertheless, on issues of conflicting testimony, a witnesses' credibility, and the persuasiveness of evidence, we defer to the jury. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

CONCLUSION

We affirm Gilberto Ibarra-Aldaco's three convictions.

No. 40126-0-III
*State v. Gilberto Ibarra-Aldaco*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:


_____
Cooney, J.

_____
Lawrence-Berrey, C.J.

13